[Crim. No. 4254.  In Bank.—October 27, 1939.]

## THE PEOPLE, Respondent, v. JAMES CHARLES WILLIAMS, Appellant.

No appearance for Appellant.

Earl Warren, Attorney-General, William F. Cleary, Deputy Attorney-General, and Earl Redwine, District Attorney, for Respondent.

THE COURT.—On his arraignment for plea on a charge of having murdered two men, named respectively E. H. Weimers and Robert Clay Martin, defendant pleaded guilty.  Evidence which thereupon was introduced and which related to the manner in which the crimes were committed, and the surrounding circumstances, disclosed the existence of the following pertinent facts, to wit: Defendant was a farm laborer, 32 years of age.  For a considerable period of time preceding the date of the commission of the two homicides, defendant had been in the regular employ of Weimers, who was engaged principally in the raising of turkeys on a 40-acre ranch owned by him and located near the town of Blythe, California.

During the period of such employment, and up to the date when the homicides were committed, defendant had been living in a tent which he owned and which occupied an appropriate space on the property of his employer. For some reason that apparently was satisfactory to Mr. Weimers, defendant was relieved of his regular duties as an employee, and Robert Martin was employed permanently in the place of defendant, who was, however, permitted to continue in the occupancy of his tent, which remained on the premises. After Martin had supplanted the defendant as permanent employee, the services of defendant were engaged by Weimers only for short periods of time, or on odd jobs, as emergencies occurred which required extra help. Apparently, no ill feeling existed between defendant and either or both of the other two men. However, it appears that, secretly, defendant resented the fact that he had been displaced in his employment by Martin, and that defendant nursed that resentment against both of the other men. On the day on which the homicides were committed, Weimers left his ranch and, in an automobile which he owned, went on a trip to the town of Blythe. The record shows that during the absence of Weimers, defendant resolved to kill both Martin and Weimers, and made his plans accordingly. Defendant knew that at about 4:30 o'clock P. M. Martin was in the habit of feeding the turkeys on the ranch, and that, at about that hour, in order to procure the necessary grain for that purpose, Martin would enter a certain building referred to as a ''brooder house'' that was located on the property. Defendant was the owner of a .22 caliber repeating rifle, which he loaded, and thereupon ''lay in wait'' for Martin behind the said building. After Martin had reached the entrance of the building,—at what appeared to defendant to be a favorable moment for the accomplishment of his purpose,—defendant shot Martin in the face with the rifle. Thereupon Martin ran from the immediate presence of defendant, who followed Martin and shot him again, first in the back and then in the back of the head. After Martin had fallen, defendant dragged the body of Martin ''by one foot'' a short distance and covered it with some straw, in order that the body might not be seen by any person who might be passing the property, or who might call thereat for any purpose. It also appears that Weimers was the owner of two dogs. Before he left his ranch to go to the town of Blythe, in accord-

ance with his usual custom in that regard, he placed the dogs within a small enclosure or yard that was adjacent to his house on the premises. In consequence of the shooting of Martin, the dogs barked and made considerable disturbance. Fearing that such noise might attract the attention of some passerby, defendant shot and killed both the dogs and thereupon concealed their bodies in a "cooler", a small wooden structure that was built against the house. Defendant then entered Weimers' house, which he carefully searched for money and other valuables. He secured several articles of clothing belonging to Weimers, his .38 caliber revolver, some cartridges for the revolver and 27 cents in cash. Defendant also procured a single-barrel repeating shotgun, which was the property of Weimers, which he loaded and thereupon proceeded to "lay in wait" for Weimers. On Weimers' appearance at the ranch, and near the place where he had concealed himself, defendant shot and killed Weimers with such gun, in practically the same manner in which theretofore defendant had killed Martin. Thereupon, defendant appropriated Weimers' automobile to his own use and attempted to make his escape,—taking with him the wearing apparel and other articles belonging to Weimers which he had secured from the house. However, the commission of the crimes was soon discovered and defendant was apprehended at a distance of about 80 miles from the ranch. He not only freely and voluntarily confessed that he had killed both Martin and Weimers, but also, after he had been returned to the scene of the crimes, he reenacted the manner in which and indicated the place where each of the offenses had been committed.

Defendant having pleaded "guilty", and the evidence that was thereupon introduced having disclosed the existence of facts and circumstances substantially as hereinbefore has been set forth, the degree of defendant's crimes was "determined" by the court to be murder in the first degree, and judgment was thereupon pronounced that, as penalty therefor, defendant should "suffer death".

Under the provisions of section 1239 of the Penal Code, an appeal to this court from the said judgment has been "automatically taken without any action by the defendant or his attorney". Although, on his arraignment for plea defendant was represented by counsel, neither brief nor oral argument has been presented to this court in behalf of defendant.

The duty therefore has been cast upon this court to search the record herein for the purpose of reaching a conclusion as to the question whether defendant was accorded a fair hearing, both at the time when he entered his plea and immediately thereafter, on the taking of evidence by the court, to the end that the degree of the crimes might be determined. As hereinbefore has been stated, on his arraignment for plea in the trial court, defendant pleaded "guilty" to each count that was contained in the information which had been filed against him,—following which, in accordance with the provisions of section 1192 of the Penal Code, evidence was received by the court solely for the purpose of determining the degree of the offenses that had been committed by defendant. (8 Cal. Jur. 457; 13 Cal. Jur. 674.)

Other than an implication that might be said to arise from the fact that a few objections were interposed by counsel who represented defendant,—regarding the admissibility of certain exhibits,—no procedural or other irregularity of any sort appears in the record. In regard to those objections, the most that is disclosed is that,—in the matter of introduction in evidence of certain photographs,—for the purpose of making clear the location or relative position on the ground where certain bits of evidence were situated, the photographer placed some foreign object, such as a stick, a tin can, or a light globe,—for example, to relatively locate in such photographs "a 12-gauge shotgun shell"; a spot of blood; a shotgun wad; a .22 caliber cartridge shell; and a "hat in the ditch". Each of defendant's objections to the introduction of such photographs was overruled. Furthermore, in that connection, it appears that among the several articles of personal property that belonged to Weimers, and which defendant had stated were taken by him from the house before Weimers had been killed, were a .38 caliber Smith & Wesson revolver, a coat, trousers, shirt, hat and a pair of shoes. In attempting to place before the trial court "the entire picture" of the crimes that had been committed by defendant, the prosecution offered in evidence each of such articles. Each of defendant's objections to the introduction of such evidence was overruled by the court. But it is obvious that, since defendant already had pleaded "guilty" to the charges, it becomes questionable whether subsequent procedural errors, if any, which may have occurred during the judicial inquiry held

for the purpose of establishing a foundation for the exercise of the discretion of the trial judge in the matter of determining what penalty should be imposed, may properly be subjected to the same degree of strictness regarding the admission or the rejection of evidence as should obtain on the trial of an action in which the guilt of a defendant is to be determined. (*People* v. *Popescue,* 343 Ill. 142 [177 N. E. 739] and see annotation, 77 A. L. R. 1199, 1213.)

With regard to that question, in the case entitled *People* v. *Popescue, supra,* the court said: " . . . it must be apparent that, where a defendant waives a jury trial and pleads guilty and asks for no trial, no issues remains, and there is nothing to try. The right to a jury is waived, and with it, of course, the constitutional guaranties with respect to the conduct of criminal trials. A plea of guilty waives any defect not jurisdictional. . . . In many decisions of other jurisdictions it has been held that, where the court has discretion in fixing the punishment it may consider . . . such other evidence as it may deem necessary, as a guide in determining the punishment to be imposed, . . . and in considering evidence in aggravation or mitigation of the offense the court may consider many matters '*not admissible on the issue of guilt or innocence*' (*Toomer* v. *State,* 112 Md. 285 [76 Atl. 118]) . . . this was not a . . . trial of any kind, but was simply a statutory hearing, by which the court examined witnesses to determine whether any facts existed to aggravate or mitigate the punishment . . . " (Emphasis added.)

And in 16 Corpus Juris, page 402, section 738, it is said: "A plea of guilty is a confession of guilt and is equivalent to a conviction. . . . A plea of guilty waives any defect not jurisdictional, and which may be taken advantage of by motion to quash or by plea in abatement. . . . The right to a jury is waived also, and with it of course the constitutional guaranties with respect to the conduct of criminal prosecutions." In section 3065, page 1297, it also is said, "The court may consider the moral character of accused as a guide in determining the punishment to be imposed, and may hear for this purpose such evidence as it may deem necessary. Likewise the court may take into consideration evidence as to matters which may be in aggravation or mitigation of the offense, *although not admissible on the issue of guilt or innocence.*" Again, in section 3211, page 1363, it is said, "In determining

the punishment to be imposed the court should consider the nature of the offense and *the attending circumstances, . . .* [together with] the motives actuating the crime, . . . " (Emphasis added.)

Also, in *People* v. *McWilliams*, 348 Ill. 333 [180 N. E. 832], it was said: "The hearing is not for the purpose of determining guilt or innocence, but has for its sole object the determination of the degree of punishment of the prisoner in the light of the circumstances surrounding him. (*People* v. *Popescue*, 345 Ill. 142 [177 N. E. 739, 77 A. L. R. 1199].) In deciding this question the court is not confined to the evidence showing guilt, for that issue has been settled by the plea. *The rules of evidence which ordinarily obtain in a trial where guilt is denied do not bind the court in its inquiry.* It may look to the facts of the killing, and it may search anywhere, within reasonable bounds, for other facts which tend to aggravate or mitigate the offense." (Emphasis added.)

And in the case entitled *McCarty* v. *Hopkins*, 61 Neb. 550 [85 N. W. 540], the court said, " . . . the right to a trial, anywhere or under any conditions, may be waived, and in practice is waived, when the accused makes a judicial confession of his guilt. When no issue is raised,—when the prisoner pleads guilty to the information or indictment,—there is nothing to try. The right to a jury is waived, and within it, of course, the constitutional guaranties with respect to the conduct of criminal prosecutions." (See, also, *Hudspeth* v. *State*, 188 Ark. 323 [67 S. W. (2d) 191]; *State* v. *Reeder*, 79 S. C. 139 [60 S. E. 434, 14 Ann. Cas. 968].)

In *United States* v. *Dalhover*, (C. C. A. 7th Cir.) 96 Fed. (2d) 355, the defendant pleaded guilty to a charge of murder, and although in that case a jury was impaneled to fix his punishment, the same question arose there as is present here, that is, whether procedural errors (if any), which might have occurred during the inquiry held to determine the degree of the crime after a plea of guilty, should be subjected to the same rule of strictness—as to their admissibility or rejection as evidence—as would have been applied in a trial on a plea of "not guilty". Appellant there contended the same rules should have been applied and, in discussing the question, the court said:

"It is obvious that the lawmakers recognized that men, motives and intentions differ widely, and that the circumstances in each case are never the same. It is quite apparent that Congress provided the different degrees of punishment in order to fit the different circumstances in each case, and the different degrees of malice, premeditation, wilfulness and deliberateness as established by the evidence. A plea of guilty does not prevent or render unnecessary the proof of all pertinent facts bearing on these matters. We hold that all the pertinent facts and circumstances with respect to the robbery, the shooting . . . the flight, the pursuit, the attempted capture . . . the arrest of appellant and his associates . . . the killing of Brady and Shaffer, the actions of each of the bandits at Bangor and *all the property in their possession,* were competent not only to establish guilt if it had been denied, but to be considered by the jury in fixing the punishment. . . . At Baltimore and Bangor the bandits were merely trying to escape arrest for the robbery and murder, and what they did at that time and what they had with them was clearly admissible not only as bearing upon their guilt of the robbery and the murder, but also in disclosing a lack of contrition, and a continuity of similar and unrelated criminal tendencies which were quite proper for the jury to consider in fixing the penalty. It is contended by appellant that the court erred in admitting in evidence the blood-soaked shirt of the deceased, worn by him at the time he was shot. There is no merit in this contention. . . . Appellant further contends that the court erred in permitting the Government to have brought into the courtroom before the jury, a group of guns, including two large machine guns, seized at Bangor, and in permitting a Government witness to answer in the affirmative as to whether or not the gun resting on the clerk's desk was one of the machine guns found in the automobile which had been occupied by appellant and his two associates at Bangor. *There was no error with respect to either of these rulings.* . . . Likewise all facts and circumstances attending his arrest were admissible. . . . This, of course, would include all weapons found in appellant's possession and custody, at and immediately prior to his arrest (see *Pedersen* v. *United States,* 2 Cir., 271 Fed. 187; *People* v. *Morse,* 196 N. Y. 306 [89 N. E. 816]; *People* v. *Mar Gin Suie,* 11 Cal. App. 42 [103 Pac. 951]),

as well as those found in the custody of his abettors and confederates." (Emphasis added.)

Although not directly announcing a view to the contrary of that declared in the cited cases, but at least clearly indicating that a defendant is as much interested and has nearly as great a right in having the degree of his offense properly determined as in the first instance he has in having the question either of his guilt or his innocence legally adjudged, are the conclusions as announced in the following cases:

In the case entitled *People* v. *Bellon*, 180 Cal. 706 [182 Pac. 420], it was said: "While, as has been held, the proceeding to determine the degree of the crime of murder after a plea of guilty is not a trial, there being no issue joined, the statute does require, at least impliedly, a judicial determination based on evidence. (See *People* v. *Chew Lan Ong*, 141 Cal. 550 [99 Am. St. Rep. 88, 75 Pac. 186].) The appropriate and proper method for a court to pursue in such a case is to receive such competent evidence from the respective parties as is material to the question of degree, and, the evidence having been concluded, to pronounce its determination thereon."

And, in *People* v. *Hall*, 105 Cal. App. 359, 362 [287 Pac. 533], it was said: "Appellants next complain of the admission in evidence of their extrajudicial confessions for the purpose of ascertaining their degree of crime without a showing first being made that such confessions were free and voluntary. The contention is without merit. No objection was made by appellants to this evidence, but even assuming that the burden was upon the prosecution to show that the confessions were freely and voluntarily made before they could be properly received, a hearing to determine the degree of crime, after a plea of guilty, is in no sense a trial. (*People* v. *Chew Lan Ong*, 141 Cal. 550 [99 Am. St. Rep. 88, 75 Pac. 186].) *It is a mere investigation to determine the degree of guilt."* (Emphasis added.)

Also, in the case of *People* v. *O'Brien*, 122 Cal. App. 147, 155, 157 [9 Pac. (2d) 902], the court said: "Notwithstanding the fact that it has been decided that the hearing which may be conducted by the trial court for the purpose of determining the degree of offense 'is not a trial', nevertheless the only means by or through which the court is authorized to reach a conclusion in the matter is by the aid of evidence. (*People* v. *Chew Lan Ong*, 141 Cal. 550, 551, 553 [99 Am.

St. Rep. 88, 75 Pac. 186, 187] ; *People* v. *Bellon,* 180 Cal. 706 [182 Pac. 420, 421].) . . . In effect, in each of the foregoing cases the Supreme Court held that the defendant was in no-wise prejudiced by the irregular manner in which the hearing had been conducted. A similar conclusion in a like proceed-ing was reached in the case of *People* v. *Hall,* 105 Cal. App. 359 [287 Pac. 533], where the error of which complaint was made consisted of the admission in evidence of extrajudicial con-fessions 'without a showing first being made that such confes-sions were free and voluntary'. . . . in each of the latter [cases] a regular hearing was had; while in the instant case there was no hearing as such. Neither from the record herein, nor from the statements of respective counsel, does it appear that, other than the formal application by defendant for pro-bation, coupled with the 'report' thereon by the probation officer, any attempt was made by the trial court to ascertain the facts essential to a determination of the degree of the offense. . . . It may not therefore be legally declared that the action of the trial court in the premises was not sub-stantially prejudicial to the rights of defendant.'' (See, also, *Commonwealth* v. *Polens,* 327 Pa. 554 [194 Atl. 652].)

However, in the instant case, the question discussed in the cited cases becomes purely academic for the reason that, on consideration of the objections which were made by defendant, it is clear that none of them was meritorious or of such im-portance that, had they been sustained, a result different from that which was reached by the trial judge would have been probable, or even humanly possible. Judged by the evi-dence, the guilt of defendant was unmistakable; nor could his sanity reasonably be questioned. True, as the result of his deliberate acts and intent, he murdered two men in cold blood; but, aside from the acts themselves, as disclosed by de-fendant's extrajudicial statements, the evidence shows entire sanity on the part of defendant. The killings were carefully planned by defendant, and were executed in minute detail in accordance therewith. He fully realized—at the time they were planned—that he was about to commit infamous and re-volting crimes; and he knew that if he did so, and that fact should be judicially established, he would be sentenced either to suffer death or, at least, to life imprisonment. He de-liberately chose to commit the offenses and take the chances of escape,—or, failing in that regard, to pay whatever penalty

might be imposed. As expressed by some of the alienists who, prior to the entry of the plea by defendant, and the taking of evidence relative to the degree of the crimes, had made an examination with regard to the mental status of defendant, he was sane both at the time when the crimes were committed, and when he was arraigned for plea. In the eyes of the law, in no sense was either of the homicides either excusable or justifiable. It manifestly appears that no prejudicial error was committed by the trial court in the course of the proceedings had against defendant.

The judgment is affirmed.