[Crim. No. 1713.    Third Appellate District.—February 2, 1940.]

THE PEOPLE, Respondent, v. FRED BUTTERFIELD, Appellant.

W. H. Hazell and Elliott, Veeder, Sullivan & Dunham for Appellant.

Earl Warren, Attorney-General, and J. Q. Brown, Deputy Attorney-General, for Respondent.

THOMPSON, J.—This is a proceeding in the nature of a writ of *coram nobis*. The defendant has appealed from an order refusing to vacate and set aside a judgment of conviction of murder of the first degree and to permit him to withdraw his plea of guilty and enter a plea of not guilty with the privilege of a trial by jury. The attorney-general has moved to dismiss the appeal on the grounds that the petitioner waived his right to a writ of *coram nobis* by failing to appeal from the judgment of conviction within the time allowed by law, and that he is guilty of laches in waiting ten months before moving to set aside the judgment.

The petitioner was charged by an information filed in the Superior Court of Lake County with murdering one Abraham L. Lee, on August 18, 1938. He voluntarily surrendered to the authorities on September 1, 1938, and was placed in jail at Lakeport and transferred ten days later to a cell with

a prisoner by the name of England who was serving sentence for passing a fictitious check. The petitioner first pleaded not guilty to the charge of murder. Subsequently he was permitted to withdraw that plea and enter a plea of guilty. In the verified affidavit which he filed on this proceeding, he claims that he was persuaded to enter a plea of guilty by his cellmate, England, who told him that he represented the district attorney with authority to assure him that if he pleaded guilty to the charge he would be punished for no higher offense than that of manslaughter. The petitioner was without means to pay for a defense, and the court appointed an attorney to represent him. But the appellant did not tell his lawyer of the assurance which he had been given that he would be punished for no higher offense than that of manslaughter. After the plea of guilty had been entered, the court took testimony, from which it determined that the accused was guilty of murder of the first degree, and thereupon sentenced him to imprisonment at San Quentin State Prison for the period of his life.

The writ of *coram nobis* lies to correct an error of fact, as distinguished from an error of law, when no statutory remedy for the wrong exists or when the statutory remedy is inadequate. (*People* v. *Mooney,* 178 Cal. 525, 529 [174 Pac. 325]; *People* v. *Reid,* 195 Cal. 249 [232 Pac. 457, 36 A. L. R. 1435]; 27 Cal. Law Rev. 228.) When a defendant is deprived of the right of trial by jury, by extrinsic fraud, misrepresentation, coercion or wrongful persuasion, which neither a demurrer nor a motion in arrest of judgment will reach, the writ may lie. It is also true that when the wrong complained of has been once presented on an appeal from the judgment, the writ will not lie to again review the same matter. (*People* v. *Reid, supra.*) In the present case the petitioner claims he was persuaded to plead guilty by the misrepresentation of England, who was acting as a stool pigeon for the officers to procure that result. The fraud of England was extrinsic. Neither a demurrer nor a motion in arrest of judgment was available. No appeal from the judgment was taken. We therefore assume the writ of *coram nobis,* under such circumstances, is a proper remedy. (*People* v. *Miller,* 114 Cal. 10 [45 Pac. 986]; *People* v. *Schwarz,* 201 Cal. 309 [257 Pac. 71]; *People* v. *Bostic,* 167

Cal. 754, 755, 760 [141 Pac. 380]; *People* v. *McCrory*, 41 Cal. 458.) ▉ In California the office of the writ of *coram nobis* is exercised by a mere motion to set aside a judgment after the time for appeal has expired and the judgment has become final. (*People* v. *Mooney, supra.*)

▉ Under the circumstances of this case we are of the opinion the petitioner is not barred from prosecuting this writ by lapse of time or by laches. Upon his arraignment the court appointed a lawyer 76 years of age, who was deaf and inexperienced in the practice of criminal law. The petitioner was able to discuss the proceedings in his case with his attorney with great difficulty. His lawyer was not able to hear with any degree of accuracy the proceedings which occurred in open court. He was not aware of the conduct of England. After the petitioner's plea of guilty and the court's determination that he was guilty of murder of the first degree, he was immediately taken from the courtroom and transferred to San Quentin within two days thereafter. He did not have the opportunity to thereafter confer with his attorney about the deceit of England. He was astonished and stunned by the unexpected finding of murder of the first degree. It was not until several months later, when his brother, for the first time, learned of England's fraud, and chanced to consult with his own attorney, that it was discovered there might be a remedy for this wrong by *coram nobis*. Under such circumstances, in the interest of justice, we are of the opinion the lapse of ten months should not bar the petitioner from the right to maintain this action.

The motion to dismiss the appeal is denied.

▉ It is true that when the evidence is conflicting on the essential issues in a proceeding on *coram nobis*, a reviewing court will not disturb the order of a trial court refusing to set aside a judgment. (*People* v. *Davis*, 187 Cal. 750 [203 Pac. 990].) ▉ In the present case, however, with the exception of a single inference which has little weight there is no substantial conflict on the chief issue regarding the false representations and fraud of England in persuading the petitioner to plead guilty to the charge of murder. It is true the district attorney testified he did not authorize England to secure the petitioner's plea of guilty by means of a promise that he would not be punished for any offense higher than that of manslaughter. We assume the district

attorney did not authorize England to make that promise. Certainly the district attorney could not bind the court to such a promise. The evidence seems clear, however, that the district attorney, the sheriff and England operated together ''to secure a confession'' of guilt from the accused. The sheriff failed to testify that he did not authorize England to make that promise to the petitioner. The district attorney admitted that petitioner was placed in a separate cell by himself for ten days after he surrendered to the officers; that England proposed to him and to the sheriff that if they would place the petitioner in a cell with him, he might secure a confession from him; that the officers consented to that proposal, and Butterfield was placed in a cell with England for that purpose; that England was furnished a Penal Code, which, it is conceded, he used to good purpose in aiding him to persuade the petitioner to plead guilty; that the statement of the petitioner was afterwards taken by the district attorney in the sheriff's office in the presence of the two officers and England. The presence of England at that hearing indicates he was acting as a stool pigeon. The petitioner positively testified that England told him he represented the district attorney and that he was authorized to promise him that if he pleaded guilty to murder he would not be punished for any offense higher than that of manslaughter. That statement of the petitioner is not contradicted. He was not called as a witness, although he was then on probation subject to order of the court, and his whereabouts should have been easy to discover. The failure to procure his presence and to leave undisputed so serious a charge of fraud is unfortunate. The effective use of a fellow prisoner, under the circumstances disclosed by this case, to aid in inducing an accused person to plead guilty to the serious crime of murder which might carry with it the death penalty, should be critically scrutinized to be very sure that a great wrong has not been inflicted.

After procuring the written statement of the accused, the preliminary hearing occurred. He was fairly informed of his legal rights, but it is doubtful if he appreciated the force of that advice. He was not then represented by counsel and he was financially unable to employ any. He took the witness stand and freely related his story of the entire affair, which sounds very plausible. If his story is true he acted

in self-defense in striking the deceased. At most, his conduct, as related by him, would amount to no more than manslaughter. There is but a single circumstance, afterwards related by the coroner, which creates any possibility that the petitioner struck the deceased with premeditation, deliberation or malice aforethought. That circumstance may reasonably be reconciled with his innocence of murder and his expectation that he would be punished for manslaughter only. The record seems to refute the possibility of his having acted with premeditation or malice. The entire record corroborates his story in the main which convinces us that the homicide was merely the result of a sudden drunken quarrel and an unintentional killing, inducing the petitioner to honestly believe he was guilty of no higher offense than manslaughter and that if he accepted England's advice to plead guilty he would not be punished for any greater offense. His story is practically undisputed, with the exception of outturned pockets of the deceased. There was no eye-witness to the affray other than the deceased and the accused. It is unreasonable to assume there was any motive for him to have deliberately killed a poor migrant fruit picker without means and with whom the petitioner has been on the best of terms. If the deceased had possessed any money or property worth stealing it would have been easy for the prosecution to have proved that fact by bartenders from whom liquor was procured, or by his companion who occupied the camp with him by the riverside at the outskirts of Kelseyville. That was not done. None of these men were called as witnesses. It appears that a grave injustice may have been inflicted on the petitioner by procuring him to plead guilty through the influence of England.

The facts show that the petitioner, a young man of previous good character for peace and quiet, had resided for several years with his parents three miles from Kelseyville. Six witnesses, including a physician of local prominence, testified that he was industrious, reliable and peaceable. He had never been in any other serious trouble except on one occasion when he was arrested on a charge of theft of an automobile under section 503 of the Vehicle Code, although he did occasionally drink to excess. He was a laboring man and a painter. He had a savings account of $54 and additional cash in the sum of about $28. The deceased was an

itinerant fruit picker, in poor health, who lived with a partner in an improvised camp on the margin of Kelsey Creek near Kelseyville.

The evening before the homicide the petitioner met Abraham Lee in Kelseyville. They had not been previously acquainted. They spent the evening associating on the friendliest terms, drinking beer together in local saloons. There is absolutely no evidence of any quarrel or ill-will between them until the sudden dispute over a trivial incident which occurred at the time of the affray. Both of them were under the influence of liquor. After midnight they started toward their respective homes together. The deceased was carrying a loaf of bread. Neither of them was armed with a weapon. They followed the roadway which paralleled the creek at a distance of about twelve feet. The petitioner stepped on a stone and stumbled against the deceased. Mr. Lee became angry and abused the petitioner, striking him with such force as to knock him down. The petitioner arose and struck back at the deceased, knocking him down. In response to a direct inquiry, the accused admitted that he did not know whether he struck the deceased with his fist or with a stick or stone. This story refutes the theory of preparation or premeditation for the assault. The petitioner says he was stunned by the unexpected result of his blow. The body of the deceased indicated no evidence of violence except a bruise over the right eye and temple. The skull was not fractured. There was a clot of blood beneath the skin. He may have fallen on a rock. The petitioner walked away a distance of 200 feet or more, when he realized the deceased might be seriously injured. He returned and examined the body. Then he dragged it off the roadway about twelve feet to an open space between two clumps of willow trees on the margin of the stream, and sparsely covered the body with some dry willow branches. He then proceeded to his home. He drew his money from the bank and went to Santa Rosa, thence to San Francisco, and later to Bellingham, Washington. In ten or twelve days he returned to his home. Upon learning that the officers were looking for him, he voluntarily surrendered himself into their custody. An investigation was made and the charge of murder was filed against the petitioner some fifteen days later.

The body of the deceased was not discovered until about ten days after the homicide was committed. The coroner testified that when he first saw it, the pants' pockets were pulled out. The petitioner positively declared that he did not feel in the pockets of the deceased. That is the only circumstance which gives any color to the assumption that Mr. Lee might have been killed by the petitioner with robbery as the motive. It seems unreasonable to believe an impecunious person would be killed for that reason. The theory of robbery under the circumstances of this case does not seem reasonable. But the motive for striking the deceased, which unfortunately resulted in his death, is important only for the purpose of throwing light on the question of whether the petitioner pleaded guilty as a result of the fraudulent inducement of England, leading him to believe he would be punished for no higher offense than that of manslaughter.

It was assumed the petitioner's flight furnished some evidence of his guilt. That is true. But it does not necessarily furnish evidence of the degree of the crime of which he may be guilty. It is some evidence that one thereby seeks to avoid prosecution for violating the law. It is some evidence of the commission of the homicide, but it is entitled to little weight in support of the theory that it was perpetrated with premeditation, deliberation or malice aforethought. Regardless of the crime of which the petitioner may be guilty, the fraud and undue influence which it appears that England exercised to induce the petitioner to plead guilty is not justifiable, for it wrongfully deprived him of the right of trial by jury.

The order is reversed and the court is directed to permit the petitioner to withdraw his plea of guilty and to enter a plea of not guilty with the privilege of a trial by jury if he so desires.

Tuttle, J., and Pullen, P. J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on February 17, 1940.