[Crim. No. 1947. Third Dist. Mar. 28, 1946.]

In re ARTHUR DE BEAU CARR on Behalf of GORHAM OWL STEVE, for a Writ of Error Coram Nobis, a Writ of Error Coram Vobis and a Writ of Habeas Corpus.

698

Arthur De Beau Carr for Petitioner.

Robert W. Kenny, Attorney General, James O. Reavis, Deputy Attorney General, Chas. E. Johnson, District Attorney, and Mark M. Brawman, Assistant District Attorney, for Respondent.

ADAMS, P. J.—On May 26, 1945, Arthur De Beau Carr, an attorney at law, filed in the Superior Court of Siskiyou County an application on behalf of Gorham Owl Steve "for the Writ of Error Coram Nobis, Writ of Error Coram Vobis and the Writ of Habeas Corpus," alleging therein that said Gorham Owl Steve was imprisoned and restrained of his liberty by the warden of the state prison at Represa. His imprisonment was alleged to be in violation of the Fourteenth Amendment of the Constitution of the United States and section 13 of article I of the Constitution of California, for the alleged reasons that his conviction of murder of the first degree was "had and obtained through duress, fraud and mistake of fact"; that the sheriff had told defendant that he should plead guilty to the charge else he would hang; that defendant's attorney, Mr. Collier, had told defendant that he was charged with manslaughter and upon pleading guilty would be sentenced to prison for five years, and that the district attorney had agreed thereto, and had acted in such manner as to indicate the truth of Mr. Collier's representation; that Mr. Collier had told defendant that he should plead guilty to the crime of manslaughter else he would hang, and that the district attorney had agreed not to demand the death

penalty; that the defendant, "not knowing, understanding or realizing the distinction between murder and manslaughter allegedly pleaded guilty to murder when in fact he thought he was pleading guilty to manslaughter"; that defendant, an Indian, could neither read, write, speak nor understand English but was nevertheless denied an interpreter; that the information and amended information were read to defendant but he was not presented with a copy of same nor was it translated to him; that defendant did not plead guilty; that he was not properly defended by counsel; that the trial judge was guilty of an abuse of discretion in that he failed to swear an interpreter for defendant; that defendant was denied a preliminary hearing by his attorney; that defendant is feeble-minded or at least of low mentality, and is deaf and insane; and that defendant was found guilty of first degree murder upon perjured testimony of his wife and brother-in-law; and that no appeal had been taken from the judgment of conviction. The prayer of the petition was that defendant "be restored to his liberty, granted a fair trial upon the merits, and/or for any, all and such other relief" as to the court should seem proper in the premises.

A writ of habeas corpus issued and defendant was produced before the court. The district attorney filed a demurrer to the petition, together with an answer denying the allegations thereof, and a hearing was had before the Honorable C. A. Paulsen, who, after hearing testimony adduced by petitioner, filed a written opinion and an order discharging the writ. From said order petitioner has prosecuted his appeal to this court.

It is here contended by appellant that notwithstanding the decision of the superior court upon the evidence adduced before it, this court should on this appeal disregard same, make its own independent determination of the facts upon the evidence before the superior court, and conclude therefrom that the relief demanded in the petition should be granted.

We shall assume for the purposes of this case that an appeal from the decision of the lower court is proper. (See *People* v. *Gilbert*, 25 Cal.2d 422 [154 P.2d 657]; *People* v. *Reid*, 195 Cal. 249 [232 P. 457, 36 A.L.R. 1435]; *People* v. *Deutsch*, 16 Cal.App.2d 121 [60 P.2d 155].) And though it was held in *People* v. *Deutsch, supra,* that an appellate court

may not, in such case, weigh the evidence, we have, nevertheless, examined the entire record before us, and have concluded therefrom that the order of the superior court was proper, and that petitioner failed to sustain the burden of proof which was upon him, to establish facts which would justify the issuance of the writs, or any of them, for which the petition prayed.

■ That the burden of proof was upon petitioner is well established. (See *People* v. *Lewis,* 64 Cal.App.2d 564, 565 [149 P.2d 27] ; *People* v. *Deutsch, supra; State* v. *Ray,* 111 Kan. 350 [207 P. 192], cited in *People* v. *Gilbert, supra,* at p. 426; *State* v. *Spencer,* 219 Ind. 148 [41 N.E.2d 601, 603].)

■ Also the presumptions that official duty has been performed and that the records of the prior trial are correct and the proceedings were regular, are applicable. (Code Civ. Proc., § 1963(15, 17) and § 273.)

Petitioner first introduced in evidence the transcript of the proceedings at the time of the conviction of Gorham Owl Steve (hereinafter referred to as Gorham) in November, 1929, which shows that at the time of defendant's arraignment he was asked if he had a lawyer, and replied "yes"; that Mr. Collier appeared for him; that the information was read, and the clerk stated, "I will now hand you a copy of the information"; that when defendant was asked if Gorham Owl Steve was his right name he answered "yes." The matter was then continued four days for plea, at which time, it appearing that the defendant had suffered a prior conviction for burglary, the information was ordered amended to so charge, and the cause was continued until the following day. On arraignment on the amended charge the defendant again admitted his name, and when he was asked by the clerk whether his plea was guilty or not guilty, the following occurred:

"The Clerk: To this information, what is your plea guilty or not guilty?

"The Court: Does he understand, Mr. Collier? Does he understand the language enough?

"Mr. Collier: Well, ask him, does he plead guilty or not guilty.

"The Defendant: Guilty.

"The Court: What is it he pleads, guilty?

"The Clerk: Have you suffered a previous conviction?

"The Defendant: Yes.

"MR. JOHNSON: Were you in San Quentin one time for burglary? You were down to state prison at one time?

"THE COURT: It was Folsom.

"MR. JOHNSON: Do you know where Folsom is, by Sacramento? You were down there one time? Judge Lodge sent you down there?

"THE DEFENDANT: Yes."

The cause was then continued for two days for the taking of evidence as to the degree of the crime. At the continued hearing Mrs. Gorham Owl Steve was called. She testified, without objection, that she had seen Gorham outside her house about five o'clock the morning of the homicide; that he had a gun with him; that he called "George" two times (George being George McCash) and that her son Harry went and opened the door and "got shot"; that she knew Gorham's voice, and also looked out the window and saw him with the muzzle of the gun pointed toward the door, and heard the shot; that the boy, Harry, started upstairs, but fell and died; that Gorham went away; and that she saw him again about three o'clock in the afternoon going toward his house in a boat. Mr. Collier asked the witness a few questions on cross-examination, whereupon the court queried her at length, developing the fact that the evening before the homicide George and Harry McCash and her sister Alice had gone to a dance at Orleans and the men had returned shortly before the defendant appeared; that she had two children by Gorham who lived with her, and that defendant sometimes came to see them; that he never had any trouble with Harry, but that George and Gorham did not like each. other "because that money," and that George had sometimes not allowed Gorham to come there after she got a divorce; that George McCash was her brother, and the house in which they lived was his.

George McCash was next called and testified to going to the dance, and that they had picked Gorham up on the way, taken him to the dance, and returned him to his house on their return in the morning; that Gorham was not drinking that he knew of; that there was some argument when Gorham got out of the car, but no fight; that he heard the shot that killed Harry and heard Gorham call "Hey! George"; that he knew Gorham's voice; that he had started downstairs but Harry reached the door first; that he did not go out and

did not see defendant until about 3 p. m., when he saw him go across the river to his place in a boat. The court asked this witness numerous questions and elicited the information that Harry had no gun, that Gorham had previously come ''sneaking'' around the place with a gun.

Elmer Johnson, next called, testified that he went to the dance with George and Harry McCash the night before the homicide, and that they picked up Gorham on the way and brought him back in the morning, and that he was not intoxicated. This witness was also questioned by the court.

Gorham Humphreys was next called and testified that he went with the sheriff looking for defendant after the shooting; that defendant was not at his home when they first went there but that there was a sign on the door that said something about ''on the way to Orleans''; that later they returned to Gorham's house, and found evidence that he had been there since their first visit; that the next day they found defendant asleep in the brush a short distance from his house, and the sheriff then took him into custody; that he (Humphreys) asked defendant some questions and defendant told him he had shot the boy, but had shot him through mistake—that he had shot the wrong man, but did not say whom he wanted to kill; that they found a gun in Gorham's house and that defendant said that was the gun he used to shoot the boy with; that defendant was sober.

Upon this evidence the district attorney urged a judgment of first degree murder, though he did not recommend the death penalty.

Gorham was next sworn and questioned by the court. He answered some questions but when asked how old he was, and when his birthday was, said he did not know. When the court stated that defendant had pleaded guilty to burglary and sentenced to Folsom, and asked defendant if that was the only time he had ever spent in a penitentiary he answered ''That is all.'' He gave his father's name, stated that both his parents were dead, that he had two children, a boy three years old whose name was William, and a girl whose name he did not know; that he had never gone to school. When asked what kind of work he did, he answered, ''Any kind of work,'' but that he did not work very much. He was then questioned by the district attorney:

''Q. Why did you shoot Harry McCash? What made you shoot him? Did you want George McCash; were you going to shoot him? A. Yes.

"Q. And Harry McCash opened the door and you shot? A. Yes, I make mistake.

"Q. You made a mistake. All right. That is all.

"THE COURT: Q. Why did you want to kill George McCash? A. What?

"Q. Why did you want to kill George McCash? A. Bother all the time.

"Q. Bothered you? A. Yes.

"Q. He never fought you; you never have any fight? A. Yes.

"Q. How many times you fight? A. One time down at Somes Bar.

"Q. One time? A. Yes.

"Q. Did you fight with fist; just fist fight or did you have guns or knives? A. Yes.

"Q. Which? A. Hands.

. . . .

"Q. Did you have trouble with George McCash coming up from the dance that morning, when you came up from Orleans? Did you have trouble when they let you out there at your home? A. Two weeks before.

"Q. Two weeks before that? A. Yes.

"Q. What did you have trouble about then, did you have a fight? A. He says 'no business to come to his place.'

"Q. You were up there with a rifle? A. I happened to be there.

"Q. You happened to be there with your rifle? A. Yes.

"Q. And George McCash told you to get away from there with your rifle? A. Yes, sir.

"Q. And what were you doing with your rifle up there? A. Pack in my hand, rifle."

At the conclusion of the hearing the court sentenced defendant to imprisonment for life.

Coming now to the testimony adduced in support of the petition before us, Gorham himself was first sworn, and under questioning by the court stated that he had been in Folsom for the last ten years; that he didn't know why he went there; that his work there was "cleaning up the yard"; that he had been there fifteen years; that he did not like the food; that he had lived on the Klamath river "All my life," and was born there. When first asked if his parents were alive answered "yes" but when asked by the district attorney "Is

your father dead or alive," answered "Dead," and said that his mother was dead too. At this point counsel for Gorham suggested that the court talk to Gorham through an interpreter, but the court continued its interrogation:

"Q. Did you know a man by the name of Cash down on the Klamath? A. What? Cash?

"Q. George Cash? A. Yes, I knew him.

"Q. You knew George Cash? A. Yes.

. . . .

"Q. You knew nobody by the name of Harrison Cash? A. Yes, I knew him.

"Q. You knew him? A. Yes."

Questioned by his counsel as to whether he had ever had a paper read to him at the time he was "here," answered "no." The same answer was given to the question whether he thought he was charged with murder. He further testified:

"Q. [MR. CARR] Did Mr. Collier ever tell you to plead guilty? A. Yes.

"Q. Did he say why? A. No, he just——

"Q. (Interrupting) Did Mr. Collier tell you to plead guilty? A. Yes.

"Q. Did he tell you why? A. No, he says you are drunk some place.

"Q. You were drunk and somebody saw you, was that your answer? Was that your answer? Why did Mr. Collier tell you to plead guilty? A. Collier told me to plead guilty.

"Q. Who told you to? A. Collier?

"Q. Collier? A. Yes.

"Q. Owl, did anybody tell you that you would only get 5 years if you pleaded guilty? A. Judge.

"Q. The Judge? A. Yes.

"THE COURT: What Judge? A. He told me if I would plead guilty he would send me 5 years in prison.

"Q. He told you he would send you five years in prison, that is what you said, was it? A. Yes.

"Q. Now, which judge told you that? What was the name of the judge? A. Judge.

"Q. Was it in this room here? A. Yes.

. . . .

"MR. CARR: Q. Where did the judge see you, Owl, when he talked to you? A. Right here.

"THE COURT: Q. Right here in this room? A. Yes.

"Q. He said if you plead guilty he will give you five years?
A. He told me that if you plead guilty.

"Q. He told you that if you would plead guilty? A. Yes.
'I send you five years in prison.'

"Q. Would you send you 5 years in prison? A. Yes.

"Q. And that happened right here in the court room, did it? A. Yes.

. . . .

"MR. CARR: Q. Now, did Sheriff Calkins tell you to plead guilty. A. He told me——

"Q. THE COURT: (Interrupting) That is what the sheriff told you. What did the sheriff say to you? A. He told me——

"THE COURT: (Interrupting) He told you to plead guilty anyway? A. Yes.

"Q. Did he tell you what the judge would give you? A. Five years.

"Q. The sheriff said the judge would give you five years? A. Yes; five years after parole.

"Q. Where did you talk to the sheriff about this? A. What?

"Q. Where did you talk to the sheriff? A. Downstairs.

"Q. Downstairs? A. Yes.

"Q. In the jail? A. Yes.

"Q. Was anybody else there besides you and the sheriff? A. No.

"Q. Just you and the sheriff? A. Yes.

"Q. How many times did he talk to you? How many times did the sheriff talk to you about this? A. Two times, I think.

"Q. Two times? A. Yes.

"Q. Did he tell you that both times? A. Yes.

"Q. He told you, he said 'You plead guilty and the judge will give you 5 years?' A. Yes.

. . . .

"Q. [MR. CARR] Owl, did you kill Harrison McCash? A. I don't know nothing about it.

"Q. 'I don't know nothing about it'? A. No.

"Q. Did you kill him? A. I don't know.

"Q. Did you go over and shoot Harrison McCash? A. I don't know."

He was then questioned about his whereabouts the night before the homicide, and his answers confirmed in substance the testimony of the witnesses at the original hearing except

that he stated that he was drinking at Orleans. But he further stated that when he arrived home in the morning he went to sleep and that he did not go to George McCash's house. He admitted that before going to Orleans he had written a sign on his door, which he said was for the purpose of informing his uncle that he had gone to Orleans and would "come back tomorrow"; that he remembered being arrested and that it was on October 1st; that the sheriff asked for his gun and was told where it was; that it was a "30/30" but had no shells in it because "can't get no shot," and "caps worn out." Also:

"Mr. Carr: Q. Did sheriff Calkins say that you used that gun to kill Harrison McCash? A. Yes.

"Q. What did you say to him? A. I said he made a mistake.

"Q. Now, what did you mean by 'made a mistake'? A. I asked him if he made a mistake.

"Q. Mistake about what? A. If I called Harrison McCash.

"Q. Do you mean that you made a mistake or that the sheriff made the mistake? A. I told him that he made a mistake.

"Q. You told him that he made a mistake? A. Yes.

. . . .

"Mr. Carr: Q. Did you tell the sheriff that you made a mistake or that he made a mistake? A. I told him mistake.

"Q. That he made the mistake? A. Yes.

"Q. He made it? A. I say 'I don't know nothing.'

"Q. 'I don't know nothing'? A. Yes.

"Q. And that he made a mistake? A. Yes.

"Q. Did you tell that you—— did you tell the sheriff that you shot Harrison McCash, by mistake? A. Yes.

. . . .

"The Court: Did the sheriff ask you if you shot McCash? A. Yes.

"Q. And what did you say? A. I says 'Maybe a mistake. I don't know nothing.'"

He also testified that Mr. Collier talked to him:

"Q. [Mr. Carr] And what did he say? A. He asked me—— I say 'What trouble.' He asked me if I killed somebody. I says 'I don't know nothing.' He says 'You shot somebody, McCash and that you plead guilty.'

"Q. And that you plead guilty? A. Yes. He says 'You drunk; somebody see you.'

"Q. 'You drunk; somebody see you'? A. Yes.

"Q. So told you to plead guilty? A. Yes.

"Q. All right. Now, did you tell him that you weren't guilty? A. Who?

"Q. Collier? A. He come up. He says 'Plead guilty.' "

. . . .

"Q. [The Court] . . . What was the first thing he said when he came into the jail; the very first thing he said to you? A. He asked me if I was picking or making trouble.

"Q. And what did you say? A. I said I don't know nothing.

"Q. 'I don't know nothing.' And then what did he say? A. He says 'You shot McCash.'

"Q. He said 'You shot McCash.' A. Yes.

"Q. And then what did you say to that? A. I says 'I don't know nothing about it.'

"Q. 'I don't know nothing about it.' And then what did Collier say? A. He says 'Maybe better you plead guilty; somebody see you drunk.'

"Q. 'Somebody see you drunk.' A. Yes.

"Q. Did he tell you somebody saw you shoot McCash? A. Yes.

"Q. Just what did Collier say to you? Tell me exactly what his words were? A. That is what he said 'Plead guilty.' He come up and plead guilty himself.

"Mr. Carr: Now, did Mr. Johnson ever talk to you? A. No.

. . . .

"Q. Now, he didn't tell you to plead guilty, did he? It was Collier, wasn't it? A. Collier, that is right.

"Q. All right. Now, did Collier tell you that you would get light punishment? A. I couldn't understand that. I can't understand.

"Q. You don't understand? A. No.

"Q. Did Collier tell you what sentence you would serve if you pleaded guilty? A. He says 'Maybe a year in prison.'

"Q. 'Maybe a year in prison'? A. Yes.

"Q. That is what Collier said? A. Yes.

"Q. Did he say anything about hanging? A. No.

"Q. Did Collier say anything about hanging; about you hanging? If you pled guilty, you would only get a year? A. Yes.

"Q. Now, did he say what happened if you pled not guilty? A. 'If you lose, you hang' ";

that Collier said he talked to Johnson (the district attorney) but that he did not know what Johnson said; that he did not

ask; that he talked to the sheriff, "After, in the court house." His counsel then questioned him as to his appearance before any other judge, apparently in an effort to establish that he had had no preliminary examination, and the witness stated he had appeared before only one judge. He said, under questioning by his counsel, that at the prior hearing he did not know what any of the witnesses said, that he did not himself plead guilty.

"Q. And do you remember whether you pleaded guilty or not guilty or made any kind of a plea at all? A. No.

"Q. Did anybody plead for you? (No answer)

"Q. Did you say 'Guilty.' A. Judge says what you did? You plead guilty? And Collier says, 'Plead guilty.'

"Q. Now, when Collier said 'Plead guilty,' did you plead guilty? A. Collier plead guilty, but I didn't say nothing.

"Q. 'Collier pled guilty, but I didn't say nothing.' Collier, then was the one that said 'guilty'? Is that correct? A. Yes."

But when questioned by the court his answers were not the same.

"THE COURT: Q. Did you know what Collier said when he pled guilty? You heard him say that, did you? A. Collier said first.

"Q. You heard Collier say 'plead guilty,' did you? A. Yes.

"Q. You knew what was going on? A. I know what he said.

"Q. You knew what he said? A. Yes. Already plead guilty, he said.

"MR. CARR: At no time did you say that you were guilty? A. At the last; at the last time.

"Q. Let me ask you this: Did you at that trial plead guilty or did Collier plead guilty? A. Collier plead guilty all.

"Q. And you didn't plead guilty at all? A. No.

"Q. All right. You remember the Judge asking Mr. Collier if you understood? A. No.

"Q. Do you remember anything that happened in this trial at all? Did you understand any of the things that went on? A. No."

He stated that he was hard of hearing; that he did not know he was pleading guilty to murder. Under examination by his counsel he again stated that he did not talk to Mr. Johnson nor the latter to him.

In an attempt to explain the defendant's prior testimony regarding his "making a mistake" he was questioned as follows:

"Q. [MR. CARR] Now, did you realize that at time the record shows you said: 'Yes, I make mistake'? A. No.

"Q. Did you say that at that time, 'I make mistake?' A. Maybe I said it.

"Q. Maybe you said it, but you don't know? A. Yes.

"Q. Well, did you mean by that that you made a mistake in shooting George McCash? A. I don't think so, no.

"Q. You don't think so. Then the Judge, the Court started talking to you, according to this record and asked the question: 'Why did you want to kill George McCash?' Now, did you give any answer to the Judge at that time? A. He asked me something I don't understand.

"Q. You didn't understand. The record shows that you said: 'Bother all the time.' Now, do you remember telling the Judge that you said George McCash bothered you all the time? A. Yes.

"Q. Did George McCash bother you all the time? A. Well, sometimes.

"Q. Sometimes. Did you ever have any fight? A. No, just a hand fight.

"Q. Just a hand fight? How many times? A. One time.

"Q. One time. Where was that? A. At Fort Jones.

"Q. At Fort Jones. Did you ever have any fight at Somes Bar? A. No.

. . . . .

"Q. All right. When you did fight him, did you fight with fists or did you use guns or knives? A. No.

"Q. How did you fight him? A. By hand.

"Q. Hand. Who got the best of it? Who won? A. Won?

"Q. Yes. Did he lick you or did you lick him? A. Nobody."

When queried as to some of the questions asked him by Judge Luttrell, who presided at the former trial, he remembered some of them, but denied remembering the questions asked of him and his answers regarding the actual shooting. Regarding his conversations with his attorney he said he had tried to tell him that he had gone to "Super's house" (and not to the McCash house) but Mr. Collier said nothing, except that he would be sentenced to "One year in prison," "to plead guilty and one year in prison. He said I go to work again after a year," but that Mr. Collier did not say he had arranged it with the judge or the district attorney, or with anybody. In an apparent effort to clear up what had been

said by Gorham regarding a mistake, the following questions were asked:

"THE COURT: Q. Did you talk to Gorham Humphreys at any time? A. No; outside in the car before arrested?

"Q. Outside in the car before you were arrested? A. Yes.

"Q. And Humphreys talked to you? A. Yes.

"Q. MR. CARR: Q. All right. Now what did you tell him? A. I told him I make mistake.

"Q. What kind of mistake; a mistake in being arrested? A. Shot by somebody.

. . . .

"MR. CARR: Q. Is that what you said, that you told Gorham Humphreys that the kid was shot by somebody? A. Yes.

"Q. Did he know that the kid had been shot when he talked to you? A. I asked him questions.

"Q. What did you ask Humphrey? A. I asked him a couple of times.

"Q. You asked him a couple of times what? A. I asked him a couple of times——

"THE COURT: (Interrupting) What did Humphreys say when you were in the car? A. What?

"Q. What did Humphreys say to you? A. He asked me——

"Q. (Interrupting) What did you say? A. I says: 'It is a mistake.'

"Q. 'It is a mistake.' That is all he says.

"MR. CARR: All right. Was that a mistake in their arresting you? A. No, that shot.

"Q. Well, what was the mistake? (No answer)

"Q. What was the mistake, Owl? A. What you asked me. I told you a couple of times, too.

"Q. Was the mistake in arresting you or that you shot the wrong man by mistake? A. That is where you asked me.

. . . .

"THE COURT: Q. What do you mean by saying that there was a mistake. Go on and explain it to us. Tell us what you mean when you say: 'I think there is a mistake.' What kind of mistake? A. That is what he asked me.

"Q. When you said to the Sheriff and Gorham Humphreys, 'It is a mistake,' what kind of a mistake did you mean? A. He asked me if I shot somebody else.

"Q. Well, what did you mean? What did you mean by saying it was a mistake? (No answer)

. . . .

"Q. Gorham, did you ever tell Humphreys that you shot George McCash by mistake? A. No.

"Q. Did you mean that?

. . . .

"Q. Did you mean that they were making a mistake arresting you? A. No.

"Q. Well, what was the mistake? A. They asked me if I shot somebody else.

"Mr. Carr: I think he means 'told' instead of 'asked.'

"The Court: I think so, yes.

"Mr. Carr: Q. Do you mean they made a mistake in telling you that you shot somebody? A. Yes."

Regarding his understanding of the proceedings, he testified under questioning by Mr. Carr that he did not understand anything that went on at the trial, though he now knew what was going on; that he did not understand now very much better than before. He gave some testimony regarding the employment of an attorney after going to Folsom, who had told him that he was sentenced for life; but had done nothing for him; also that he had made several applications for parole. Regarding his employment of Mr. Collier he stated that the latter came to see him, that he paid him $57 down and promised to pay him $250; that he paid him $100 after he was in Folsom, that he had a letter in his pocket. But this letter was one from Mr. Collier stating that he had received several letters from Gorham, but that the $100 check had not been sent to him but to Gorham Humphreys.

He also testified on cross-examination that Judge Luttrell had told him he would get parole after five years; that this was after he pleaded guilty.

In support of the petition it was next shown that Gorham had not had a preliminary examination. The justice of the peace of the township so testified, and he was also questioned as to the mentality of Gorham, having known him for many years. He stated that Gorham was a "slow sort of fellow," who kept to himself and had little to say to anyone, but that he seemed to understand when witness talked to him. This witness first said that it was his opinion that Gorham was not sane; he changed it on cross-examination, saying he would not say he was insane; but that it was the opinion of some people that he must be crazy because he was off by himself and talked to himself; that if he shot the boy he supposed he

would understand the nature and consequences of his act; that he knew what was right and what was wrong—that he knew it was wrong to take a human life.

Louise Hickox testified that she had known Gorham to some extent before he was married, that he was a queer fellow, that he used to be referred to as "Crazy Owl," because he never associated with people, and when spoken to answered in Indian; that he could write though he never went to school.

Former Judge C. J. Luttrell was next called in support of petitioner, but stated he had no independent recollection of the circumstances of Gorham's arraignment, etc.—that the record would have to speak for itself; but that at the time of the proceedings he had absolutely no reason to question the competency of defendant's counsel, Mr. Collier; that the latter was recognized as able counsel and a good lawyer, and was generally so regarded by the bar.

This evidence terminated the proceedings.

█ From the foregoing we think that it sufficiently appears that petitioner failed to prove the allegations of his petition. The allegations that the sheriff and defendant's attorney told defendant that he should plead guilty or he would hang, that his attorney told him that he was charged only with manslaughter and that if he pleaded guilty would be sentenced for five years, and the allegations that he did not understand English and the nature of the proceedings, have no support in the evidence except the unsatisfactory testimony of defendant himself, and it does not appear that he pleaded guilty in reliance thereon rather than because he had committed the crime charged; and there is no evidence that the district attorney acted in any manner to indicate that he knew or had agreed to the alleged representations of defendant's counsel. It was said in *People* v. *Deutsch,* *supra,* that advice of counsel cannot be said to constitute duress or threats.

█ The contention that defendant did not himself enter the plea of guilty is not only contrary to the record, but is inconsistent with some of the statements of defendant himself. Petitioner's counsel urges that because the trial court at the time of plea asked "What is it he pleads, guilty?," it must be concluded that defendant did not so plead. However, the court reporter apparently heard the defendant's answer, and if there be doubt the record is, at this late date,

entitled to the greater credence. (*In re Evans,* 70 Cal.App.2d 213, 216 [160 P.2d 551].)

■ As for the competency of defendant's counsel, the only evidence adduced showed him to have been able and competent; and we find nothing in his conduct from which either inability or neglect of the interests of his client can fairly be inferred.

Petitioner's present counsel argues from a statement made by Mr. Collier at the time of the hearing to determine the degree of the crime which was that from the looks of defendant and the talks he had had with him he did not believe that "he could conceive a premeditation that would last long enough to go across the river"—that defendant was "in the same position as an animal," that it must be concluded not only that the defendant was so lacking in understanding as to be insane, but it must also be concluded that Mr. Collier failed in his duty to his client in allowing him to plead guilty, and in not insisting that an interpreter be sworn for him. But we do not believe that either conclusion is justified. The statements of counsel were certainly not evidence, nor can it be said that in the light of subsequent events his conduct of the case was inefficient. The evidence fails to show that defendant was insane; and regarding his competency to speak and understand the English language, the trial judge who saw and heard him, and was therefore better able than we are to judge of his ability to speak, hear, and understand, said in his written opinion that in order to determine these matters he had questioned the witness at length and that he was "satisfied beyond the slightest doubt that petitioner was well able to understand the questions and respond in English *when he wished to do so*"; that "During his examination in the present hearing, petitioner had no great difficulty in hearing, in understanding, or in answering the many preliminary questions asked; but repeatedly, when vital questions touching upon the shooting of Harry McCash were propounded to him, he was unable to hear, to understand or to express himself"; that "This subterfuge is as old as crime itself and is confined to no single race"; that much was made of petitioner's statement that he "made a mistake," but that everything showed that what he was talking about was not the entry of his plea, but the fact that he had intended to kill George and had killed Harry. His conclusion was that petitioner was neither insane nor lacking in understanding of the English

language or the nature of the charge; that he was familiar with court proceedings, having been convicted before. We think that the excerpts from the testimony, which we have set forth at length, sustain this conclusion.

■ Regarding the contention that the trial court erred in failing to appoint an interpreter, this was matter resting in the discretion of the court, and we find no abuse of discretion. (See *People* v. *Young,* 108 Cal. 8, 10 [41 P. 281]; *People* v. *Morine,* 138 Cal. 626, 628 [72 P. 166]; *People* v. *Lopez,* 21 Cal.App. 188, 190 [131 P. 104].)

■ As for petitioner's contention that it was error to permit defendant's wife to testify against him, the court said in *People* v. *Gilbert,* 22 Cal.2d 522, at page 528 [140 P.2d 9]:

"A hearing for the determination of the degree of an offense and the punishment therefor is not a trial in the full technical sense, and is not governed by the same strict rules of procedure as a trial. As stated in *People* v. *Williams,* 14 Cal.2d 532, 536 [95 P.2d 456] (quoting from *People* v. *Popescue,* 345 Ill. 142, 153, 158 [177 N.E. 739, 77 A.L.R. 1199]) it is 'simply a statutory hearing, by which the court examined witnesses to determine whether any facts existed to aggravate or mitigate the punishment,' and 'in considering evidence in aggravation or mitigation of the offense the court may consider many matters *"not admissible on the issue of guilt or innocence"* ....'"

■ It may be added that it is not the province of the court in a proceeding such as this to review mere errors properly reviewable on appeal from the judgment of conviction. (*People* v. *Reid, supra; People* v. *Superior Court,* 4 Cal. 2d 136, 149 [47 P.2d 724]; *People* v. *Gilbert, supra,* at page 444; *People* v. *Butterfield,* 37 Cal.App.2d 140, 142 [99 P.2d 310].)

■ Furthermore, there was evidence in the record, without the testimony of defendant's wife, sufficient to support the trial court's finding that the admitted homicide constituted murder of the first degree; and defendant suffered no miscarriage of justice by reason of the testimony of his wife. (See *People* v. *Van Skander,* 20 Cal.App.2d 248, 254 [66 P.2d 1228]; *People* v. *Bellon,* 180 Cal. 706, 707 [182 P. 420].)

The order of the trial court discharging the writ and remanding the prisoner is affirmed.

Thompson, J., and Peek, J., concurred.