**UNITED STATES, Appellant,**

**v.**

**Abdul HAMID, a/k/a Hilvan Jude Finch, Appellee.**

**No. 85–1639.**

District of Columbia Court of Appeals.

Argued Sept. 23, 1986.

Decided Sept. 15, 1987.

 

Ilene G. Rosenthal, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., and Michael W. Farrell, Paul L. Knight, and Judith Hetherton, Asst. U.S. Attys., Washington, D.C., were on brief, for appellant.

Greta C. Van Susteren, with whom Timothy Junkin, Washington, D.C., was on brief, for appellee.

Before PRYOR, Chief Judge, and MACK and FERREN, Associate Judges.

MACK, Associate Judge:

The government appeals from the trial court's order granting appellee's petition for a writ of error *coram nobis* and reducing his sentence to time served. We affirm.

A writ of error *coram nobis* is an " 'extraordinary remedy' " which should be granted " 'only under circumstances compelling such action to achieve justice.' " *United States v. Higdon,* 496 A.2d 618, 619 (D.C.1985) (quoting *United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98 L.Ed. 248 (1954)). The trial court granted the writ based on the finding that both appellee and his trial lawyer were under duress at the time of appellee's trial and sentencing and were unable to present mitigating information to the court for it to determine the proper sentence. Appellee has carried his burden of showing that an error amounting to a " 'miscarriage of justice,' " *United States v. Higdon, supra,* 496 A.2d at 620 (quoting *Moon v. United States,* 106 U.S.App.D.C. 301, 303, 272 F.2d 530, 532 (1959)) occurred at his sentencing hearing. We find that the trial court properly exercised its discretion in granting the petition for writ of error *coram nobis.*[1]

## I

The relative simplicity of the issue as framed—*i.e.,* whether the trial court abused its discretion in granting the writ of error *coram nobis*—belies the long and complex procedural history of this case. That history is essential to an understanding of the trial court's decision.

On May 3, 1977, appellee Abdul Hamid, also known as Hilvan Jude Finch, along with eleven other defendants, was indicted and later brought to trial on a multiple count indictment. Appellee, who neither took the stand nor offered any evidence on his own behalf, was convicted by a jury of conspiracy to commit kidnapping while armed, assault with a dangerous weapon, and eight counts of kidnapping while armed in connection with the takeover of the B'nai B'rith Headquarters. On September 6, 1977, appellee was sentenced by the court to an aggregate of 36 to 108 years imprisonment. At the time of sentencing, appellee did not present mitigating information to the trial court that might have served to lessen the sentence imposed by the trial court. Appellee's conviction (along with the convictions of the eleven codefendants) was later upheld on appeal. *Khaalis v. United States,* 408 A.2d 313 (D.C.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980).[2] Appellee did not join his codefendants who sought review by the United States Supreme Court, which denied the petition for a writ of certiorari on February 19, 1980. The mandate issued by this court affirming

---

1. The trial court also granted, in the alternative, appellee's petition to vacate sentence and for a writ of *habeas corpus* pursuant to D.C.Code § 23–110 (1981). Since we sustain the trial court's grant of appellee's petition for writ of error *coram nobis,* we do not address the propriety of the grant in the alternative of the petition to vacate sentence and for a writ of *habeas corpus* under § 23–110.

2. Appellee's name was mentioned only once in the court's discussion of specific issues in the fifty-one page *Khaalis* opinion. *See Khaalis v. United States, supra,* 408 A.2d at 355.

appellee's conviction was received by the Superior Court on February 28, 1980.

On June 25, 1980, 118 days after receipt of the mandate, appellee filed a motion to reduce his sentence pursuant to Super.Ct. Crim.R. 35(b). More than four months later, the government filed an opposition to appellee's motion. Following a hearing on December 10, 1980, at which time the court heard extensive testimony about the life experiences of the 22–year–old appellee and his limited role in the takeover of B'nai B'rith, the court granted the motion to reduce sentence and reduced appellee's sentence to time served.

The government filed a petition for a writ of mandamus, alleging that the trial court had no jurisdiction to rule on appellee's motion because 120 days had elapsed after receipt of the mandate. On May 14, 1981, a division of this court held that the trial court had no jurisdiction beyond the 120–day period specified in Rule 35(b) to rule upon appellee's motion to reduce sentence. *United States v. Nunzio*, 430 A.2d 1372 (D.C.1981). Appellee filed a petition for rehearing and/or hearing *en banc*, asking the panel to reconsider its decision or the full court to vacate the panel opinion and set the case for *en banc* reargument. He argued that the panel's decision to interpret Rule 35(b) as a jurisdictional deadline and not a filing deadline was contrary to the rule as previously understood and widely accepted. The petition was denied,

and the trial court vacated its January 8, 1981 order reducing appellee's sentence.[3]

Appellee next moved to vacate his sentence pursuant to D.C.Code § 23–110 (1981). On September 23, 1981, the trial court conducted a hearing and was presented with evidence supporting appellee's claim that he was denied effective assistance of counsel because his attorney failed to file a motion to reduce sentence in time for the trial court to consider and rule upon the motion. On October 2, 1981, the trial court found that appellee was denied effective assistance of counsel and vacated appellee's sentence, resentencing appellee to time already served.[4] The government appealed the trial court's decision, arguing that appellee was not denied effective assistance of counsel. In *United States v. Hamid*, 461 A.2d 1043 (D.C.1983), this court reversed the trial court's ruling, holding that the Sixth Amendment right to effective assistance of counsel does not attach to post-conviction motions seeking reduction of sentence. The trial court was instructed to reinstate appellee's original sentence and appellee's petition for rehearing *en banc* was denied on August 31, 1983.

On September 13, 1983, appellee petitioned the trial court for a writ of error *coram nobis*. Appellee requested that the trial court find a fundamental flaw in appellee's sentencing hearing due to duress, and to thus vacate the September 6, 1977 sentence and afford him an opportunity for

---

**3.** Rule 35 was later amended to comport with what appellee contends was the pre–*Nunzio* practice that motions seeking reductions of sentence be filed within 120 days after imposition of sentence and ruled on within a reasonable period of time. *See* FED.R.CRIM.P. 35(b) (amended 1985), and advisory committee note. *See also Williams v. United States*, 470 A.2d 302, 308 (D.C.1983), *vacated*, 470 A.2d 312 (1984), *on rehearing en banc*, 485 A.2d 950 (D.C.), *cert. denied*, 472 U.S. 1019, 105 S.Ct. 3483, 87 L.Ed.2d 617 (1985) ("it appears to have been standard Superior Court practice for lawyers to file Rule 35 motions toward the end of the 120–day period, and for judges to rule on these motions after the 120–day period had closed.... At the time appellant's counsel filed his Rule 35 motion, every federal court that had decided the question had construed the 120–day limit as a filing deadline. Moreover, this court repeatedly had sanctioned the same construction" (citations

and footnote omitted). *See also Nunzio v. United States, supra*, 430 A.2d at 1375–80 (dissenting opinion).

**4.** The court vacated appellee's sentence in reliance on this court's decision in *Cade v. United States*, 311 A.2d 265 (D.C.1973). In that case, the defendant's motion to reduce sentence was not filed until after the expiration of the 120–day period. This court found the defendant Cade's contention that his attorney rendered him ineffective assistance of counsel in failing to file the motion before the expiration of the 120–day period came within one of the exceptions to the then existing 120–day jurisdictional time-bar provided for in Rule 35. This court remanded, indicating that if the trial court found defendant's attorney ineffective, it could treat the motion as timely filed and rule upon the motion on its merits.

resentencing. Appellee contended that he was prevented from raising a defense at trial and from presenting mitigating factors to the trial court at sentencing due to fear, duress and threats of force and violence directed at appellee, appellee's family, appellee's lawyer, and his lawyer's family by the leader of the Hanafi Muslims, Hamaas Abdul Khaalis. Two months later, the government filed a written opposition to appellee's petition for a writ of error *coram nobis*.

During the course of a status hearing held December 12, 1983, argument was heard concerning the effect of the decision by this court in *Williams v. United States*, 470 A.2d 302 (D.C.1983) on appellee's original Rule 35 motion to reduce sentence.[5] The *Williams* court held that *Nunzio* should be applied prospectively only and not retroactively. Thus, the trial court surmised it would have jurisdiction to rule on appellee's original Rule 35 motion. First, however, the trial court inquired whether the government intended to petition for an *en banc* review of *Williams*. Appellee's motions pending in the trial court were held in abeyance pending the outcome of the government's petition for rehearing *en banc*, filed January 27, 1984. Rehearing *en banc* was granted April 2, 1984, and the panel's opinion in *Williams* was vacated. Argument was heard on May 16, 1984, and on January 18, 1985, this court sitting *en banc* split evenly, 4 to 4, in ruling on the government's petition.

A hearing was conducted before the trial court on February 22, 1985, during which the court granted appellee's motion for reduction of sentence based upon the split *en banc* decision by this court in *Williams*. On February 27, 1985, the government filed a motion for reconsideration urging the court to vacate its decision of February 22, 1985, which granted appellee's motion

to reduce sentence. The government argued that the net effect of the split *en banc* decision by this court was to affirm the judgment of the trial court. The trial court thereafter vacated its order.

On May 30, 1985, appellee filed a Petition to Vacate Sentence and for a Writ of *Habeas Corpus*, pursuant to D.C.Code § 23–110. The government filed an opposition to appellee's petition on July 15, 1985, one and one-half months later. A hearing was conducted before the court on July 19, 1985, on appellee's previously filed petition for a writ of error *coram nobis* along with the petition to vacate sentence and for a writ of *habeas corpus*. The matter was continued to September 10, 1985 and on that date the trial court heard testimony as well as arguments from appellee and the government relating to each of appellee's petitions then pending before the court. Based upon the testimony adduced at the September 10, 1985 hearing and the entire record in this case, including the testimony and exhibits adduced at the hearings conducted before the court on December 10, 1980, and September 23, 1981, and adopted by the court at the September 10, 1985 hearing the trial court concluded that the writ should be granted.[6]

## II

In *United States v. Higdon, supra*, this court held that the primary function of the writ of error *coram nobis* at common law was to " 'correct errors of fact on the part of the trial court, not attributable to the negligence of the defendant, when the errors alleged [were] "of the most fundamental character; that is, such as rendered the proceeding itself irregular and invalid," ' " *Id.* at 619 (citing *Moon v. United States, supra*, 106 U.S.App.D.C. at 303, 272 F.2d at 532). The writ of error *coram nobis*

---

5. In *Williams,* the defendant had filed a Rule 35 motion to reduce sentence on the 119th day after his sentence had been imposed. The motion was filed six months before the decision in *Nunzio.* The trial court in *Williams* did not rule on the defendant's motion until two months after *Nunzio.* The trial court denied defendant's motion, citing *Nunzio* for the proposition that the court lacked jurisdiction to rule on defend-

ant's motion because 120 days had elapsed since imposition of the sentence. This court reversed, holding that the trial court was not barred from ruling on the merits of the defendant's motion.

6. The court set forth extensive findings of fact in a thirty-nine page Memorandum Opinion and Order supporting its conclusion.

provides a petitioner the opportunity to "correct errors of fact not apparent on the face of the record and unknown to the trial court." *Watwood v. District of Columbia,* 162 A.2d 486, 487 (D.C.1960).[7]

■ We reject the government's argument that appellee's claim is not one legally cognizable by way of a writ of error *coram nobis* (*see* Part III–E *infra*). We also reject the argument that appellee is foreclosed from seeking this relief because of the passage of time. The writ of error *coram nobis* is, as at common law, "allowed without limitation of time," *United States v. Morgan,* 346 U.S. 502, 507, 74 S.Ct. 247, 250, 98 L.Ed. 248 (1954). The fact that Hamid did not file his petition for the writ until more than three years after his Rule 35 motion, and more than two years after his first § 23–110 motion does not bar his claim. In *Morgan,* the petitioner waited eleven years before raising his claim that his 1939 guilty plea was invalid because it was entered without the benefit of counsel and he was unaware of his legal rights. The Supreme Court remanded for an evidentiary hearing. As the court in *Farnsworth v. United States (Farnsworth II),* 98 U.S.App.D.C. 59, 63, 232 F.2d 59, 63 (1956) found, delay may deplete the strength of the petitioner's claim, but does not operate to bar the claim:

> [i]f a defendant without good reason waits a long time before asserting his claimed right, with the consequence that many witnesses are dead, he might have difficulty maintaining his burden of proof, or a heavier burden of proof might be imposed upon him.... But where the fundamental constitutional right has been denied, an accused should not be precluded from relief because he cannot satisfy a court that he had good cause for any delay in seeking it. *"To permit a defense of laches to the writ would, in*

*effect, denude it of one of its essential characteristics—the power to hurdle a time factor."* *Haywood v. United States,* D.C.S.D.N.Y., 127 F.Supp. 485, 488 [emphasis added].

*See also Moon v. United States, supra,* 106 U.S.App.D.C. at 302, 272 F.2d at 531 (where available, *coram nobis* is "allowable 'without limitation of time' " (citing *Morgan, supra,* 346 U.S. at 507, 74 S.Ct. at 250); *Flippins v. United States,* 747 F.2d 1089, 1091 (6th Cir.1984) ("[t]he writ of error *coram nobis* is available to a convicted criminal at any time following the entry of judgment against him or her"); *United States v. Cariola,* 323 F.2d 180, 183 (3d Cir.1963) (twenty-four year delay in petitioning for writ of error *coram nobis* does not bar relief); *Puente v. United States,* 676 F.2d 141 (5th Cir.1982) (fact that sentencing judge's failure to make explicit "no benefit" finding under the Federal Youth Corrections Act occurred in 1968 no bar to bringing a petition for the writ; court remanded for resentencing); and *United States v. LaVallee,* 319 F.2d 308, 313 (2d Cir.1963) (six and a half year delay between sentencing and date of *coram nobis* petition to state courts not sufficient to deprive petitioner of hearing on merits of coercion claim).

While the passage of time cannot be found to preclude the granting of this extraordinary writ on purely legal grounds, delay in asserting the basis for its invocation might, in any given case, affect the credibility and/or viability of a petitioner's claim. In the instant case, however, delay cannot operate to preclude relief. Here the trial court unequivocally found Hamid's claim of duress to be credible, despite Hamid's failure to *directly* assert it at earlier post-conviction proceedings. Moreover the very nature of the factor underlying Ham-

---

7. BLACK'S LAW DICTIONARY 1444 (5th ed. 1979) defines the purpose of the writ of error *coram nobis* as follows:

> [T]o correct a judgment in the same court in which it was rendered, on the ground of error of fact, for which the statute provides no other remedy, which fact did not appear of record, or was unknown to the court when judgment was pronounced, and which, if

known, would have prevented the judgment, and which was unknown, and could not have been known to the party by the exercise of reasonable diligence in time to have been otherwise presented, to the court, *unless he was prevented from so presenting them by duress, fear, or other sufficient cause*" [emphasis added].

id's claim of duress—the emotion, fear— was the identical factor underlying delay in assertion of the claim, a factor which dissipates any adverse inferences bearing on credibility or viability.

It is therefore not only deference to the factual findings of the trial court which supports our conclusion that Hamid's failure to assert duress earlier does not undermine his claim. There is the record itself that shows that the facts substantiating duress (which prohibited appellee from presenting mitigating information at sentencing)[8] were not revealed to the court until Hamid's trial counsel, Charles Stow, testified at the September 19, 1985 hearing. At this hearing, the trial judge learned from counsel that appellee was actually fearful for his life before, after and during trial. Stow testified that appellee believed the Hanafi Muslims, under the direction of Khaalis, would have him killed for not obeying orders regarding his conduct at defense and sentencing. He testified that appellee was under such fear that he would alert counsel during trial whenever he believed Stow was exceeding the limits set by Khaalis. Appellee's trial attorney testified further at the September 10, 1985 hearing that appellee was unwilling to provide to him any mitigating information that would be useful in allocuting at the sentencing hearing due to fear for his own safety as well as the safety of his lawyer and his lawyer's family. Stow also testified that he perceived the fear that appellee as well as his own family would be in grave danger as "substantially real," stating that he did not bring any of this information to the trial court's attention because he was certain something would have immediately happened to appellee. (*See* Part III–C., *infra.*)

Ironically, appellee had actually attempted to inform the trial judge of the duress under which he was operating long before the September 10, 1985 hearing. In a December 21, 1979 letter to Judge Nunzio in which he had asked for a reduction of his sentence, Hamid concluded his letter to the judge with the following comment: "At present I am living with an implied threat that if I try to get my sentence modified, or come forward with that of which I have confided to you, it wouldn't be conducive to my best interests. None of what I've related would want to be a matter of general knowledge." Further references to duress were made at the December 10, 1980 hearing on Hamid's Rule 35 motion where, in response to a question from the trial court concerning why Hamid had not informed his attorney of mitigating information, Hamid stated:

Your Honor, if I had told Mr. Stow—if I had told Mr. Stow everything of what happened and asked him to defend myself, I would not be living here to tell you about it. I know that. I was under great fear because I did want—I did want to request that I had a severance. There was a statement that you made in the Court when everyone was asking for that, and you said you would try that case one time. And I said to myself, "If I have Mr. Stow ask the judge to sever my trial, and he denies it, that's caput."

References to duress were also present throughout the trial court's September 23, 1981 hearing on Hamid's § 23–110 motion.[9]

---

**8.** It should be noted that the trial court considered the evidence in mitigation which was not before it at sentencing (*e.g.,* appellee's personal history and limited role in the takeover) only in concluding appellee's sentence should be reduced. This is to be distinguished from the basis for the grant of the writ of error *coram nobis,* which was that appellee (and his lawyer) were operating under duress during trial and sentencing such that mitigating information could not be presented.

**9.** Compare the two state cases cited by the dissent to support its argument that the trial court abused its discretion in granting petitioner's writ of error *coram nobis.* Duress played no part in the facts of either case, and in both cases, the appellate court *deferred* to the discretion of the trial court, *affirming* the trial court's denial of the writ of error *coram nobis.*

Specifically, in *Dearing v. State,* 631 S.W.2d 328, 333 (Mo.1982) (en banc) the petitioner argued that the trial court should have given him a continuance on the day of trial so that he could obtain a lawyer for his misdemeanor trial on drunk driving charges. The hearing court found that petitioner's failure to hire an attorney between the date when his first attorney was granted leave to withdraw and date of trial, or to request the trial court to appoint counsel,

Despite the fact that indications of duress leaked out during these earlier post-conviction proceedings, however, the issue was never squarely addressed at any time prior to the hearing on the petition for the writ of error *coram nobis* on September 19, 1985. The hearing on the earlier Rule 35 motion was primarily concerned with information about appellee's background and limited role in the Hanafi Muslim takeover; the question as to *why* some of the information at the Rule 35 hearing was not brought before the judge at sentencing was not explored. The second post-conviction proceeding occurred after this court interpreted the 120–day period identified in Rule 35 as a jurisdictional period during which the trial court had to act to reduce sentence, instead of a filing deadline. The subject of that hearing was whether Charles Stow, appellee's trial attorney, had rendered ineffective assistance of counsel by filing the Rule 35 motion when he did. It was not until this court found that there is no right to effective assistance of counsel at the post-conviction stage, and Hamid filed his petition for writ of error *coram nobis*, that the issue of duress was brought to the fore.

■ Given the unique procedural history of this case (coupled with the reluctance of the knowledgeable parties to speak out), the fact that appellee's lawyers first asserted alternative grounds for relief should not be held against appellee. As noted, in *United States v. Nunzio, supra,* this court for the first time, held the 120–day period in Rule 35 to be not a filing deadline but a jurisdictional one, foreclosing to appellee the relief which the trial court in its discretion thought warranted. Since Hamid's counsel had failed to file until 118 days after receipt of the mandate, the next logical step was to pursue an ineffective assistance of counsel claim. Rule 35 and ineffective assistance of counsel were promising avenues of relief which would not have exposed appellee to the danger which he now claims he felt (and which claim the trial court has found to be credible; it is therefore not exceptional that the more obscure writ of error *coram nobis* theory was not earlier pursued. It is available now in the interest of justice.

### III

■ The writ of error *coram nobis* requires that (1) the trial court be unaware of the facts giving rise to the petition; (2) the omitted information be such that it would have prevented the sentence or judgment; (3) petitioner be able to justify the failure to provide the information; (4) the error be extrinsic to the record; and (5) the error be "of the most fundamental character." *United States v. Morgan, supra,* 346 U.S. at 512, 74 S.Ct. at 253; *Moon v. United States, supra,* 106 U.S.App.D.C. at 303, 272 F.2d at 532; *see also Flippins v. United States, supra,* 747 F.2d at 1091 ("A fair statement of the basis for granting a writ of error *coram nobis* is demonstration of (1) an error of fact; (2) unknown at the time of trial; (3) of a fundamentally unjust character which probably would have altered the outcome of the challenged proceeding if it had been known.").

The trial court properly found that appellee satisfied each requirement of the writ. First, the trial court determined it was unaware of the facts giving rise to the

and his agreeing to proceed *pro se,* annulled his claim that the trial court error in denying his request for continuance to obtain an attorney rose to the level of fundamental error. The appellate court found the hearing court's denial of the application for the writ of error *coram nobis* was supported by substantial evidence, and deferred to the lower court's exercise of its discretion. The petitioner in *Fuller v. State,* 344 So.2d 216, 217–18 (Ala.Crim.App.1977) had been convicted of forgery and leaving a motel without paying his bill. *He applied for a writ of error coram nobis,* claiming he had been advised by his defense attorney to plead guilty because defense witnesses were out of state and could not be subpoenaed, and, that without the presence of those witnesses, there was almost no chance for acquittal and petitioner would receive the maximum if the plea bargain offer were refused. The hearing court first found that some of the witnesses were indeed beyond the court's jurisdiction, but also found that in the absence of petitioner invoking the aid of the court to procure process for other witnesses within the court's jurisdiction or requesting continuances, he was not entitled to the writ. The appellate court deferred to the lower court's exercise of its discretion.

petition because it was not informed of the duress which prevented appellee and his lawyer from presenting myriad mitigating circumstances, involving both appellee's background as well as his limited role in the Hanafi Muslim takeover. Second, the trial court determined that the omitted information was critical to the fashioning of a sentence for appellee; the sentence would have been greatly reduced if the court at sentencing had before it the information in question. Third, the court found that appellee presented reasonable justification for his failure to inform the court of all mitigating circumstances at his sentencing. The court found that both appellee and his lawyer deliberately withheld information from the court due to genuine fear for the lives of themselves and others. Fourth, the error asserted here—that appellee was estopped from presenting mitigating information due to duress—was extrinsic to the record. Lastly, the trial court found that a sentencing procedure in which significant mitigating information was deliberately not presented to the trial court for consideration due to fear of reprisal was a "fundamental" error.

### A. The Trial Court Was Unaware of Facts Giving Rise to the Petition

At the time of sentencing (September 6, 1977), the trial court was ignorant of the duress under which both appellee and his counsel were functioning in failing to present the wealth of mitigating circumstances and facts which they would otherwise have brought to the court's attention.[10] The trial court remained uninformed as to appellee's personal history, which made him peculiarly vulnerable to that duress, as well as appellee's perceived character and his limited—essentially passive—role in the takeover. The information relied upon by appellee in support of his petition for writ of error *coram nobis* recited below was presented to the court after appellee's sentencing and only after

he was separated from those who applied the duress.

The government argues that the facts that were supposedly withheld because of duress were in fact before the trial court. But the mitigating information presented at the original sentencing hearing during the allotted time of ten minutes consisted of little more than "bare bones" references to appellee's lack of a criminal record, his military service, the fact that he was not a narcotics user, and his one attempt to help a victim of the takeover. By contrast, the details emerging from the September 10, 1985 hearing, along with correspondence to the judge by appellee and others provided such a picture of appellee, as to make it clear that the court's original sentence was based on "assumptions ... which were materially untrue." *United States v. Tucker*, 404 U.S. 443, 447, 92 S.Ct. 589, 592, 30 L.Ed.2d 592 (1972) (citing *Townsend v. Burke*, 334 U.S. 736, 741, 68 S.Ct. 1252, 1255, 92 L.Ed. 1690 (1948)).

In its Memorandum Opinion and Order, the trial court identified the facts it had not known due to appellee's inability to inform counsel of certain mitigating information. As to personal background, the trial court found that appellee was one of three children of unwed parents who gave him up when he was two months old. He was given to an aunt to be raised by her until he was eight. At the age of eight, appellee moved in with his father and remained with him until the age of fifteen. The trial court found that during that seven year period, appellee was repeatedly beaten and abused by his father until finally, appellee reported his father to the police. The trial court found that the appellee appeared before a judge in a parental neglect hearing with many lacerations on his body as a result of beatings by his father. The father was declared to be an abusive parent, and, as a result, appellee and his sister were placed in a foster home.[11]

---

**10.** Part III–C., "Justification for Failure to Provide Information" sets forth the facts regarding duress of which the court was ignorant.

**11.** This information was first brought to the trial court's attention in appellee's letter dated

February 21, 1979 and was corroborated by appellee's sister, Marlene Finch, who testified at the December 12, 1980 hearing.

Reverend Carl B. Taylor informed the trial court by letter dated August 28, 1979, that he had known appellee since 1963 and that appellee had been a foster child in his home for a brief period. The trial court was informed by appellee's cousin, Shirley A. Krauser, in a letter dated April 15, 1979, that appellee could not with a clear conscience love his father "because [appellee] witnessed his father rape his nine-year-old sister." Dr. James F. Cunningham, a psychiatrist employed by the Police Court in Schenectady, New York, to perform psychiatric evaluations of offenders, informed the trial court by letter dated December 3, 1980, that appellee had lived with him and his wife in their foster home. Dr. Cunningham stated that appellee's father could not help appellee because he was too busy, too depressed and tragically overwhelmed by his complicated responsibilities as a father and mother to appellee. He stated that appellee did not have the benefit of the nurturing which a female family member might have provided during critical periods in his personality development.

Margaret B. Cunningham, Dr. Cunningham's wife, wrote three informative letters to the trial court, stating that she had known appellee since he was sixteen, that the boy had lived with her and her husband as a foster child for nearly a year, and described him as very intelligent, having "very high ideals, and fine moral values." She stated that appellee "never touched drugs, alcohol, or other stimulants and was a firm believer in living a clean life." She described appellee as having been "loved and respected by many people in [the] community, and described appellee's father as being "an extremely rigid disciplinarian." Based on this evidence and testimony, the trial court accepted appellee's statement that he experienced an unstable and unhappy childhood as the product of a broken home.

The trial court further found that during a very unstable and impressionable stage of appellee's life, at the age of 16, he met members of the religious sect known as the Hanafi Muslims. Appellee's cousin, Shirley Krauser, stated by letter dated April 15, 1979 that the leader of the sect, Khalifa

Hamaas Abdul Khaalis, asked appellee's aunt if appellee could move to Washington, D.C. to live with him. Khaalis promised that if appellee were allowed to move to Washington, D.C. he would see to it that appellee continued his education. In his letter to the trial court, appellee stated that he moved to Washington, D.C. on July 8, 1971 to broaden his knowledge of Islam. In her December 3, 1980 letter, Margaret B. Cunningham described appellee as being "very young and impressionable" when he became involved with Khaalis. She stated that appellee was "seeking positive role models—someone to believe in—someone to pattern his life after." In her opinion, appellee's attraction to the Hanafi Muslims was "based upon the strong moral values which they stressed, as well as his own need for some family ties." In her March 21, 1980 letter, she stated that appellee's "needs for a caring family, as well as his early childhood experiences in a strongly regimented environment" and his search for a "father figure" were among the reasons appellee was attracted to the Hanafi Muslims.

Appellee's testimony on December 12, 1981 is consistent with the statement submitted by Mrs. Cunningham. Appellee stated Khaalis told him on several occasions that he was like his son. By letter, he stated that he accepted Khaalis as a father. Kofi Williams Opantiri, appellee's former "big brother" stated by letter that appellee's involvement with the Hanafi Muslims was in his opinion, the result of "his personal quest for an understanding of himself and a meaningful place in life." The trial court understood the significance of these detailed hardships, and accepted these various opinions as relevant to understanding appellee's susceptibility to duress and involvement with the Hanafi Muslims in the first place. None of this information was presented to the trial court at the time of appellee's September 6, 1977 sentencing.

The trial court found that appellee completed the twelfth grade and earned a scholarship to attend the University of Iowa. Appellee's cousin stated that neither she nor appellee's mother had sufficient

funds to finance appellee's trip to Iowa. She stated that she attempted to obtain financial assistance for appellee from his parish but was unsuccessful. She also stated that appellee sought financial aid from his father but was likewise unsuccessful. Appellee was described as "demoralized and dejected" in not being able to obtain financial assistance for college.

The trial court found that appellee, at the urging of Khaalis, thereafter sought admission to the United States Military Academy at West Point. Appellee was advised to first enlist in the United States Army and obtain admission into the Army Preparatory School at Fort Belvoir, Virginia, which he did. The trial court found that appellee was performing well at the preparatory school when he learned on January 18, 1973, that the men, women and babies in the Khaalis home were brutally murdered.[12] Appellee stated in his letter that when he heard of the murders on the radio he "was in shock" and immediately "raced to Washington" knowing that he had to go to Khaalis. He stated that his "mind was in shock," that his "life had stopped," and that he "had no more interest" in his military career. On March 5, 1973, appellee resigned from the preparatory school and moved back in with Khaalis to protect the survivors and the rest of the family in case of another attack.

Appellee stated in his letter that for the following 1475 days after he moved back in with Khaalis "[i]t was extremely rare for me to leave the house." During that period, he did not attend movies, concerts, or other social affairs for fear that there would be another attack. The few times he did leave the premises, he did so to bring members of the "family to doctor appointments." This routine was necessary in order to ensure safety, and to help maneuver "the sister" who was paralyzed and con-

fined to a wheelchair. Appellee stated that he knew all of the murderers had not been caught and that "day in and day out for 1475 days every day, I relived the tragedy that happened in that home. How could I forget?" Appellee's testimony at the hearing on his motion to reduce sentence was consistent with these statements; the trial court accepted appellee's representations as credible, and found them to be useful in understanding his relationship with Khaalis as well as his role at the 16th Street house before the takeover.

In his letter, appellee stated that he took orders from Khaalis without question. He stated he had been conditioned not to ask questions or think, and during this period he had an inability to think for himself. He explained, "I did not have the mental capacity to think and discriminate on my own will power. I felt that my 'teacher,' my 'father' knew what was best."

Appellee's sister (Marlene Finch) who stated that she and appellee were always on very close terms, testified that appellee told her he was not free to leave the Hanafi residence on 16th Street. In her opinion he "was not there voluntarily." Once when he did leave, appellee's sister received phone calls from the Hanafis, demanding to know appellee's whereabouts and telling her that if she knew where he was to "tell him that he must come back." Additionally, Ms. Finch testified that appellee was not allowed to communicate with her by phone, and when Khaalis found Hamid had secretly hooked up a phone in the basement of the 16th Street house, he tore it out. Ms. Finch testified that appellee's involvement with the Hanafi Muslims was the result of "misguided loyalty" and "fear" of Khaalis. She stated that "there was no way for him to leave [the 16th Street home] without being injured."

---

12. Khaalis' twenty-five-year old son and ten-year old son were shot in the head, four infants (children and grandchildren of Khaalis) were drowned, and a friend of the family was shot and killed. Khaalis' daughter was shot several times in the head but survived, and Khaalis' wife, Bibi, although she survived, was paralyzed and rendered severely impaired, both mentally and physically.

The family home served as the headquarters of the Orthodox Hanafi Muslims in the United States. The murderers were followers of a rival religious sect known as the "Black Muslims." *See Christian v. United States,* 394 A.2d 1 (D.C. 1978).

In light of this new information, the trial court found that even though the record did not conclusively establish that the appellee was physically restrained from leaving the 16th Street house, there was sufficient evidence to suggest that appellee, in a vulnerable state which the trial court found was in part a product of his unfortunate upbringing, obeyed powerful orders—charismatic and religious in nature—given him by Khaalis, and combined with threats of serious bodily harm and resultant fear was made a virtual prisoner at the 16th Street home.

In his letter, appellee stated that he was unaware of any advanced plan or conspiracy and that he had no prior knowledge of the events that transpired on the day of the takeover. Appellee testified on December 10, 1980, that on the morning of the takeover he was on guard duty when Khaalis asked him to come inside the house. Khaalis gave him a gun, and told appellee he was to escort Khaalis and his son-in-law to New York; he was instructed to "[s]tay by my side and come with me." Appellee further testified that he heard Khaalis talking with some men concerning a movie entitled "Mohammed, Messenger of God" and that he thought they were going to protest the playing of the movie at a downtown theatre. As they drove downtown, neither he nor the driver knew where they were going or what they were going to do; Khaalis gave the directions. He stated that Khaalis spoke of the movie "Mohammed, Messenger of God" once again and at that point, they pulled up in front of the B'nai B'rith Headquarters. The trial court found that appellee's statement in his letter was consistent with his testimony. Moreover, in a letter dated April 15, 1979, Shirley A. Krauser stated that appellee told her, while he was in jail, that he had no prior knowledge of the takeover and that he believed they were going to protest the playing of the movie on the morning of the takeover. Rev. Carl B. Taylor, in his letter dated August 28, 1979, stated that he had a discussion with appellee before trial and was convinced that defendant was totally unaware of Khaalis' plan to take over the B'nai B'rith.

Based upon the statements given by appellee in his letters, the testimony elicited during the hearing conducted before the trial court on December 12, 1980 (which the court found credible), and the letters submitted by Shirley A. Krauser and Rev. Taylor, the trial court found that appellee possessed little knowledge, if any at all, of the plans to take over the B'nai B'rith Headquarters.

Appellee further testified that his main function during the takeover had been to guard a door and an elevator. He testified that although he was armed with a gun, he did not point the gun at anyone, nor did he hit anyone with the gun. Appellee testified that he delegated the duty given to him by one of the other Hanafi Muslims of "tying the people" to one of the hostages. When one of the Hanafi Muslims saw the hostage tying people's hands too loosely, appellee was told to "make him tie them tighter." He followed instructions but the hostage continued to tie people loosely. When this angered a Muslim, appellee, in order to avert a threat by the Muslim to make (the hostage) "suffer," himself "hit this man and asked him to tie the people tighter." Appellee testified that Khaalis instructed everyone as to what to do and how to do it.

Appellee also testified that he assisted one of the hostages who had a heart problem. He testified that when it was decided that the man was to be treated like all of the other hostages and be tied up and placed on a stone floor face down, he tried to assist him by placing the man on a rolled up carpet so that he would be more comfortable. James A. Slawson, a detective in the Homicide Branch of the Washington Metropolitan Police Department corroborated appellee's testimony in the December 12, 1980 hearing. He testified that he had arrested appellee after the takeover and had interviewed the hostages. Some of the hostages told Slawson during the course of his investigation that appellee assisted the man who had a heart problem. Detective Slawson testified further that some of the B'nai B'rith hostages told him that appellee "was the kindest and that he tried to help some of them when he could." Appellee

testified that he assisted women to the lavatory and that, in spite of orders to not permit the door of the lavatory to be closed, he allowed women to shut the door. Furthermore, he testified that he reminded the hostages to shake their hands after washing them and to make sure they drank water. In his letter, he stated that he tried to treat the hostages with as much empathy and dignity as the situation would allow.

Appellee further stated in his letter of December 21, 1979, that he was as much a hostage as those for whom he was convicted of holding. Shirley A. Krauser, in her letter dated April 15, 1979, stated that she felt appellee's "hands were tied" and that "[he] was just as much a hostage" as the others. Appellee testified that Abdul Razzaaq, one of the other Hanafi Muslims, was aware that appellee was not in full allegiance with Khaalis and the others and that Razzaaq knew that he himself would be killed if he did not go along with them. Appellee claims that Razzaaq was "blindly obedient" and that Razzaaq was upset with him and would have killed him had he received an order to do so. Appellee related that he did not learn of the takeover of the District Building until he heard about it on the news at B'nai B'rith. In light of this information, the court found that appellee's role in the takeover was limited, and that appellee assisted the hostages whenever he could. The court found that appellee, as a result of ignorance and fear, was coerced into participating in the takeover.

Detective James A. Slawson described appellee as having been "very cooperative" after he had been arrested. He testified that appellee told him "he was sorry that it [the siege] had happened and that innocent people had gotten involved." The detective stated that after his search of appellee yielded two or three knives, appellee whispered to him that there were two more;

"one around his neck" and "one in his groin," both of which he had missed.

In light of the testimony adduced from Detective Slawson in the December 12, 1980 hearing and Attorney Stow in the September 10, 1985 hearing, the trial court found that appellee felt remorse in having been involved in the takeover, and after the arrest of the Hanafi Muslims, cooperated with the police during their investigation.[13]

### B. Omitted Information Would Have Affected the Outcome

The second factor the court must consider in determining whether a writ of error *coram nobis* should issue is whether the error (the omitted information showing duress) would have affected the outcome. The trial court here was well within its discretion in determining that the omitted information would have affected appellee's sentence.

In imposing appellee's sentence the trial court relied upon a presentence report, a memorandum submitted by the United States Attorney's Office entitled "Government Memorandum in Aid of Sentencing," allocution by appellee's attorney, Charles Stow, allocution by the Assistant United States Attorney and by appellee.

The presentence report stated that appellee was born in Jonesville, New York, and that Khaalis was his guardian. No information was provided as to appellee's parents or family background; rather, the report indicated that appellee refused to give the name of his parents because he felt such information was irrelevant. The report stated that appellee moved to Washington, D.C. to be taught by Khaalis. It suggested that appellee's involvement in the takeover was based upon Khaalis' interpretation of the "Holy Quran" that the Muslims must defend their faith, an interpretation which, according to appellee, could not be in error or questioned. The report indicated that appellee felt he was

---

**13.** Contrast the nature and degree of information withheld involuntarily here to that not presented because of counsel's alleged negligence in *United States v. Higdon, supra,* 496 A.2d 618. In *Higdon,* the proposed sentencing plan prepared by the National Center on Institu-

tions and Alternatives (NCIA) but not presented to the sentencing judge contained information almost identical to that in the presentence report, which *was* before the judge at the original sentencing hearing.

not "programmed or brainwashed as people would like to believe" and that he was not "at an impressionable age when he joined the Hanafi Muslims." It also stated that appellee related to the crimes in which he had been convicted in an "oblivious manner" and that he felt the takeover was justified because of a need to defend his religious faith. In the reporting officer's view, appellee was committed to being a dedicated member of the Hanafi Muslims.

The report further stated that appellee claimed that while he was stationed at Fort Belvoir, Virginia, he attended prep school for West Point. It stated that appellee graduated from Calvin Coolidge High School in 1972, and that he served in the United States Army from 1972 to March of 1973 and was honorably discharged for hardship dependency. The report indicated that appellee denied any use of narcotics or alcohol and that he had no prior criminal arrests or convictions. Additionally, the report indicated that appellee told the interviewing officer that he did not believe in taking advantage of people and that it would have been "nefarious" to hurt the unarmed hostages during the takeover.

The government's memorandum in aid of sentencing stated, "Hamid, who physically assaulted Mr. Charles Fenyvesi at B'nai B'rith, should similarly receive three consecutive fifteen years to life sentences for armed kidnapping and a consecutive three to ten year term for the assault on Wesley Hymes."

In his allocution, Charles Stow requested the trial court to place appellee on probation. He stated that appellee had served in the United States Army and was not a narcotics user. He informed the trial court that appellee was neither a common thief nor a criminal. He reminded the trial court that appellee had assisted a hostage during the siege who had a heart problem and that there had been no testimony adduced during the trial suggesting appellee had engaged in violent activity. Mr. Stow's allocution covered that which was contained within the presentence report, or was disclosed during the appellee's trial. Mr. Stow presented no new information to the trial court for its consideration in fashioning the appropriate sentence for appellee.

Appellee, allocuting in his own behalf, requested the trial court to place him on probation, stating he was not a criminal and that he was a sincere, patriotic, and good citizen of the United States. The government, in its allocution, reminded the trial court that it had heard testimony during trial from Mr. Charles Fenyvesi to the effect that defendant had "smashed him in the mouth with a gun, and then smashed him in the nose with his fist." The government, characterizing defendant's actions as being "part of the plan of deliberate senseless violence," requested the court to impose the sentence recommended in its sentencing memorandum.

### C. Justification for Failure to Provide Information

Appellee was required to provide reasonable justification for his failure to inform the court of all mitigating circumstances at his sentencing. The trial court found that both appellee and his lawyer deliberately withheld information from the court because of their overwhelming and genuine fear for the lives of themselves and others.

In *Higdon v. United States, supra,* 496 A.2d at 618, the appellee also maintained that his sentencing hearing was fatally flawed because his counsel failed to set forth mitigating factors for the trial court's consideration, and failed to have witnesses testify in appellee's behalf at the hearing. But in *Higdon,* there was nothing preventing defense counsel from presenting such mitigating information. There was no allegation of fear or threat or duress of any kind. The court therefore held that appellee was really making a claim of ineffective assistance of counsel for counsel's negligence in not seeking such mitigating information or presenting it, and that the claim should · be pursued under D.C.Code § 23–110. In the instant case, the information *could not* be communicated to defense counsel. Appellee testified on December 12, 1980 that if he had told his attorney about everything that happened before the takeover and sought to defend himself: "I

would not be living here to tell you about it. I know that. I was under great fear...." Appellee testified on September 23, 1981 that he presented no defense at trial because Khaalis had ordered him not to and that disobeying Khaalis' order carried a penalty of death. When asked what he believed would happen if he were to disobey Khaalis' order, appellee responded: "I would be killed." [14]

Appellee's attorney during the trial, Charles Stow, testified on September 10, 1985, that appellee was fearful for his life before and during the trial. He stated that he attempted to persuade appellee to present a defense but was unsuccessful because Khaalis was orchestrating the defense in the cellblock behind the courtroom. He testified that he perceived appellee's fear throughout the proceeding, particularly because appellee would alert Stow whenever appellee thought he was exceeding the limits Khaalis had imposed.

Mr. Stow testified that appellee told him not to present a defense at trial, not because appellee did not want a defense presented, but rather because appellee was fearful of what might happen if Mr. Stow did. Mr. Stow said appellee was "scared to death of what was going to happen if he [appellee] started thinking on his own two feet." [15]

Appellee's trial attorney testified further at the September 10, 1985 hearing that appellee was unwilling to provide to him any mitigating information that would be useful in allocuting at the sentencing hearing. He stated that appellee told him "not to rock the boat" because something would happen not only to appellee and his family, but, in addition, to Mr. Stow and his wife and child. When Mr. Stow was asked

whether he attempted to obtain mitigating information for use during the sentencing allocution, he informed the trial court that he did and that appellee said, "Do you want my family killed? Do you want your family killed? Do you want me killed over here?" Mr. Stow further testified that at the sentencing hearing appellee nudged him at points when appellee felt he was exceeding the boundaries Khaalis had imposed. Mr. Stow stated that appellee was "scared to the point, so scared to the point that he wouldn't have risked saying anything in his behalf or allowing me to say anything in his behalf."

Mr. Stow further testified that he knew that if he attempted to present mitigating evidence something would have happened not only to appellee but to his own family as well. Mr. Stow stated that he did not allocute properly, not because he did not want to present a better allocution, but rather, if he had, appellee "wouldn't be here today." Mr. Stow testified that he felt if he had allocuted properly something might have happened to his wife and his son.

When Mr. Stow was asked how he perceived the fear that appellee as well as his own family would be killed, Mr. Stow responded that it was "substantially real." He stated that he did not bring any of this information to the trial court's attention because he was certain something would have immediately happened to appellee. Mr. Stow testified that the reason he did not request a hearing out of the presence of the others in order to inform the court of the threats was because he felt that Khaalis and the other Hanafi Muslims would have asked questions as to why appellee was the only one brought up from

**14.** Appellee's sister, Marlene Finch, testified on December 12, 1980, that she had a discussion with appellee while he was in jail awaiting trial and had inquired as to what his feelings were on what had happened. Ms. Finch gave the following statement to the trial court as to appellee's response: " 'Sis, please believe me. This I cannot tell you.' And, I know my brother. My brother and I are very close. And, I knew that if things had been going—that there was something—some reason he could not tell me." In addition, Ms. Finch testified that after appellee had been convicted and incarcerated at

Lompoc, California, she had a conversation with him. She stated that appellee said to her "do you understand now why I couldn't discuss with you what had happened, that my life was in danger?"

**15.** Appellee testified on December 12, 1980, that Khaalis had directed all of the defendants to fast during the trial. He stated that Khaalis directed him not to appeal after being convicted and not to seek a reduction of sentence.

the cellblock for the hearing. He stated that Khaalis would likely become aware that appellee disobeyed his orders and would have sought to kill him. Mr. Stow informed the trial court that the Hanafi Muslims are strong in their faith and are "very close knit in both the Federal [prison] system and the District of Columbia and other state [prison] systems." Later in the hearing, the government readily conceded that "networks" exist within the prison system.[16]

The trial court also noted that in his letter dated December 21, 1979, appellee informed the trial court that while incarcerated at Lompoc, California, he was being threatened and was told not to seek a reduction of sentence. Because of these threats, appellee requested that the trial court not make the details of his letter a matter of general knowledge.[17] In addition, he testified in the December 12, 1980 hearing that Khaalis was dictating orders, by telephone to the Hanafi Muslims within the prison system.

Mr. Stow admitted that, after the September 6, 1977 sentencing hearing, he felt as if he had not done justice to the case insofar as presenting useful mitigating information to the trial court during allocution. His references to the fact that appellee had no prior criminal record, had served in the Army, and had assisted a man during the siege offered no new information, but simply repeated what the court already knew. He testified that his feeling of constraint in this presentation was attributable to what he thought would happen to appel-

---

16. Specifically, the following colloquy occurred at the September 10, 1985 hearing:

> THE COURT: Mr. Stow, this Court recognized that at the time the courthouse was an armed camp. We are aware of that. But why? Why didn't you attempt to bring any of this to this Court's attention?
>
> I recognize that certainly there was a lot of pressure on all of you and indeed the Court tried the case in 60 days from the date of the takeover, the 9th, the 10th and the 11th.
>
> But why did you not try to get this information to the Court in some way, by way perhaps of an in camera presentation, sealed material?
>
> THE WITNESS: Because that type of thing always comes out in the end. We try to keep everything secret about it but people see you go into chambers and then they see a lot of other people going around. Eventually, it gets out—why was Abdul Hamid brought up to court alone without the rest of the Hanafi Muslims? Why were just you and Mr. Lindsky and Mr. Touhey in with Judge Nunzio?
>
> If somebody else had seen them, they would start asking them—go back and ask their client what was going on with Hamid. He is up there alone with you people and you aren't up there and then it gets out. Then people begin to think erroneously or correctly or whatever you have and the next thing you know I have a client that does not exist.
>
> THE COURT: I take it this is the same logic you applied to the possible application for motion to sever his case from the others?
>
> THE WITNESS: No question about that. The minute I did that—you see, not only the Hanafi Muslims but the Muslim faith itself is very strong. It is very close-knit in both the Federal system and the District of Columbia and other state systems. They keep very closely together.

17. The following discussion of how to ensure the safety of appellee while incarcerated locally pending the court's decision of appellee's Rule 35 motion further illustrates the court's recognition of the problem:

> THE COURT: ... Is he safe down at the D.C. Jail in view of the fact that this is the home of the other community?
>
> MR. STOW: No.
>
> THE COURT: Is there anyplace where we could feel where he could be safe? He's entrusted to the Executive Branch of Government, Mr. Knight.
>
> MR. KNIGHT: We'll have to take steps, Your Honor. I'll have to make some calls to see what can be done later today.
>
> THE COURT: Because the ultimate tragedy would be for him to be here on a reduction of sentence that I'm seriously considering and would have ruled today, except for the fact that I want this further information, only to have him victimized in our local institution. It may reflect somewhat sorrowfully on me, but somewhat more dramatically on the Government that brought him here.
>
> MR. KNIGHT: I understand the Court's concern, and we will take steps to—
>
> THE COURT: Well, you're going to have to take more than that.
>
> MR. KNIGHT: I understand. I will investigate it right now and—
>
> THE COURT: Know of anyplace?
>
> MR. STOW: No, sir; I don't really.
>
> THE COURT: No. That's because they're throughout the entire system.

> If anybody violates this unwritten code of coming up and testifying against people or getting out of line as they put it, they suffer the consequences.

lee and his own family as well. He stated that he was totally unaware of appellee's background and of the fact that appellee was a virtual prisoner at the 16th Street house. This testimony forms more than adequate justification for the failure to inform the court of mitigating circumstances at sentencing.

### D. The Error Was Extrinsic

The fourth requirement that the appellee had to meet before the court could exercise its discretion and grant the writ was that the error was extrinsic to, or did not appear in the record. *Moon v. United States, supra.* The error here—that appellee was estopped from presenting mitigating circumstances due to duress—was outside the record. In fact, the absence of a record necessitated a hearing to determine whether error had occurred. It was not until the September 10, 1985 hearing that the trial court learned from appellee's trial lawyer that genuine fear had prevented him from fully allocuting and presenting facts in mitigation of appellee's culpability.[18]

### E. The Error Is "Fundamental"

The last factor that the trial court had to consider in granting appellee's petition for writ of error *coram nobis* was whether the error was " 'of the most fundamental character.' " *Moon v. United States, supra,* 106 U.S.App.D.C. at 303, 272 F.2d at 532 (quoting *United States v. Mayer,* 235 U.S. 55, 69, 35 S.Ct. 16, 19, 59 L.Ed. 129 (1914)).

▪ First of all, we reject the government's argument that because the appellee has not argued that his conviction must be reversed, the error could not be fundamental. *United States v. Higdon, supra,* involved a challenge to sentencing yet the court did not in any way suggest that *coram nobis* was not an appropriate vehicle to challenge a sentence (as opposed to the underlying conviction). Moreover, sentencing is a critical stage of a criminal trial;

to a criminal defendant, perhaps the most important. *See United States v. Pinkney,* 177 U.S.App.D.C. 423, 429, 543 F.2d 908, 914 (1976), and *United States v. Green,* 220 U.S.App.D.C. 147, 680 F.2d 183 (1982), *cert. denied,* 459 U.S. 1210, 103 S.Ct. 1204, 75 L.Ed.2d 445 (1983). In his dissent in *Green, supra,* Senior Circuit Judge David L. Bazelon eloquently stated that

> [s]entencing is the most important part of the typical criminal trial. Effective legal representation at sentencing is critical to meeting society's urgent interest in reaching determinations that accurately and fairly build upon the past and honestly attempt to create hope for the future.

> \*　　\*　　\*　　\*　　\*　　\*

> "[T]he first essential element of effective assistance of counsel is counsel able and willing to advocate fearlessly and effectively."

*Id.* 220 U.S.App.D.C. at 155–56, 680 F.2d at 191–92 quoting *United States v. Hurt,* 177 U.S.App.D.C. 15, 20–21, 543 F.2d 162, 167–68 (1976). *See also* American Bar Association Project on Standards for Criminal Justice, Standards Relating to Sentencing Alternatives and Procedures, § 5.3(e) (1968) ("[t]he defense attorney should recognize that the sentencing stage is the time at which for many defendants the most important service of the entire proceeding can be performed").

▪ The requirements of due process are not suspended with the pronouncement of guilt, but continue to operate in the sentencing process. *United States v. Lemon,* 232 U.S.App.D.C. 396, 407, 723 F.2d 922, 933 (1983). Appellee's lawyer presented virtually no evidence in mitigation. A sentencing procedure in which significant mitigating information was deliberately not presented to the trial court for consideration due to fear of reprisal does not comport with due process, not only because of the duress itself, but also because of its

18. The record upon which the trial court's findings were based was amplified by the hearing on appellee's motions to reduce sentence and through correspondence to the trial court judge. The court first learned of appellee's fear and

subsequent inability to relate to the court facts about his personal history and his limited role in the takeover through a letter from appellee, sent after appellee was sentenced and separated from his codefendants.

consequences; a sentence based on incomplete—thereby inaccurate—information. *See Townsend v. Burke,* 334 U.S. 736, 68 S.Ct. 1252, 92 L.Ed. 1690 (1948); *United States v. Bass,* 175 U.S.App.D.C. 282, 535 F.2d 110 (1976); *United States v. Malcolm,* 432 F.2d 809 (2d Cir.1970).

The language in the court's decision in *United States v. Malcolm* regarding the requirements of due process in sentencing has been quoted many times:

Misinformation or misunderstanding that is materially untrue regarding a prior criminal record, or *material false assumptions as to any facts relevant to sentencing,* renders the entire sentencing procedure invalid as a violation of due process.

*Id.* at 816, citing *Townsend v. Burke, supra,* 334 U.S. at 740–41, 68 S.Ct. at 1255 (emphasis added.). In *Townsend,* the Supreme Court reversed the conviction of a defendant who, without the assistance of counsel, "was sentenced on the basis of assumptions concerning his criminal record which were materially untrue." The sentencing judge in *Townsend* read aloud a list of eight convictions, passing sentence in reliance thereon too quickly for the uncounseled defendant to object that, in fact, in two of the cases he had been found not guilty, and that the charge at the basis of a third "conviction" had indeed been dismissed. The Court stated that

It is not the duration or severity of this sentence that renders it constitutionally invalid; it is the careless or designed pronouncement of sentence on a foundation so extensively and materially false, which the prisoner had no opportunity to correct by the services which counsel would provide, that renders the proceedings lacking in due process.

*Id.* at 741, 68 S.Ct. at 1255. While the facts in *Townsend* involved a denial of due process of law when a defendant was prejudiced by a court's careless interpretation of evidence before it at sentencing, *Townsend* and lower federal court cases support the conclusion that the omission of material evidence from the sentencing hearing would be regarded no less significantly. As the court stated in *United States v. Lemon, supra,* 232 U.S.App.D.C. at 407, 723 F.2d at 933:

[T]he sentencing judge may not rely on mistaken information or baseless assumptions.... [H]owever, courts must be concerned not merely when a sentencing judge has relied on demonstrably false information, but "when the sentencing process created a significant *possibility* that misinformation infected the decision."

Quoting *United States v. Bass,* 175 U.S. App.D.C. 282, 290, 535 F.2d 110 (1976) (citations omitted; emphasis in original). *See also United States v. Ursillo,* 786 F.2d 66, 68 (2d Cir.1986) ("courts have long recognized the right of a defendant not to be sentenced on the basis of 'material false assumptions as to any facts relevant to sentencing'") quoting *United States v. Malcolm, supra,* 432 F.2d at 816.[19]

■ The fact that the government was not responsible for Hamid's failure to present mitigating evidence at the original sentencing hearing does not prevent the duress—and the resulting failure to inform of mitigating factors—from constituting fundamental error. The distinction between duress exerted by an agent of the state and a state agent's (*i.e.,* trial judge's) erroneous reliance on material misinformation due to an outsider's exertion of duress is not critical. The primary concern of courts is with the accuracy of the basis for the accused's sentence. Whether the duress is being exerted by the government or by an outsider, the purpose is to ensure that a defendant is sentenced properly, based on careful consideration of accurate information and all relevant, material factors. If the court does not have accu-

19. The government cites *Hill v. United States,* 368 U.S. 424, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) for the proposition that there is no requirement defendant be afforded an opportunity to allocute at all. However, in *Hill,* the court noted that the defendant was not affirmatively denied an opportunity to speak at sentencing; "nor is it suggested that in imposing the sentence the District Judge was either misinformed or uninformed as to any relevant circumstances." *Id.* at 429, 82 S.Ct. at 472.

rate, complete information before it in passing sentence, it should certainly be afforded the discretion to find that the missing information would have affected the sentence it imposed.[20]

In *United States v. Malcolm, supra,* 432 F.2d 809, the trial judge was confused about appellant's criminal record partly because of omitted information. There, the court found that even though the extent of misinformation was not great,

> we cannot assume that Malcolm suffered no prejudice from the confusion. There can be no question that the garbled criminal record was the dominant factor influencing sentence. We cannot say that the sentencing judge would have given as heavy weight to the true history as he did to his distorted version.

> \*　　\*　　\*　　\*　　\*　　\*

> The result of the procedural irregularity is that the sentence rests on a foundation of confusion, misinformation and ignorance of facts vitally material to mitigation. If justice is to be done, a sentencing judge should know all the material facts. The information which was curtailed and precluded here should therefore have been received and considered. Fair administration of justice demands that the sentencing judge will not act on surmise, misinformation and suspicion but will impose sentence with insight and understanding.

> \*　　\*　　\*　　\*　　\*　　\*

[N]o man can make valid judgments without knowledge of the facts.

*Id.* at 816, 819 (citations omitted).

Proceedings conducted while an accused was under duress have long been grounds for issuance of a petition for writ of error *coram nobis. See Sanders v. State,* 85 Ind. 318, 321 (1882) ("all men are by our laws entitled to a fair [proceeding], in abso-

lute freedom from restraint and entire liberty from fear of threats and violence. It is almost a mockery to call that a trial, or a judicial hearing, which condemns an accused upon a plea of guilty forced from his reluctant counsel by threats of an angry and excited mob"); *State of Kansas v. Calhoun,* 50 Kan. 523, 537–38, 32 P. 38, 42, 34 Am.St.Rep. 141 (1893) ("where the accused in a criminal prosecution in the district court is forced, through well-grounded fears of mob violence, to plead guilty to the criminal charge ... he has a right to relief from such a sentence or plea by an action or proceeding in the same court in the nature of a writ of error *coram nobis* "); *Hardwick v. State,* 220 Ark. 464, 466, 248 S.W.2d 377, 378 (1952) ("this writ has been sustained where the defendant was induced to plead guilty to a charge of felony through fear and by reason of the threats of a mob"); *see also Machibroda v. United States,* 368 U.S. 487, 493, 82 S.Ct. 510, 513, 7 L.Ed.2d 473 (1962) (coerced involuntary proceedings are not constitutionally permitted: "[t]here can be no doubt that, if the allegations (of coercion and duress) contained in the petitioner's motion and affidavit are true, he is entitled to have his sentence vacated. A guilty plea, if induced by promises of threats which deprive it of the character of a voluntary act is void."); *People v. Butterfield,* 37 Cal.App.2d 140, 99 P.2d 310, 311 (1940) (when a defendant is deprived of the right of trial by jury, by extrinsic fraud, misrepresentation, coercion or wrongful persuasion, the writ of error *coram nobis* may lie).

■ The whole purpose of the writ of error *coram nobis* is to achieve justice. Appellee's counsel was not free to advocate for appellee. At appellee's original sentencing, Mr. Stow merely repeated the information contained in the barren presentence report, with which the trial judge was

---

**20.** As the trial court in the case at bar reasoned: If a defendant is denied due process of law where a court, in imposing sentence, either misunderstands information or relies upon information that is false, then *a fortiori* a defendant is denied due process of law when, (as in the instant case), due to threats and fear of imminent bodily harm, constituting legal duress, he is not only prevented from presenting a defense at trial but, in addition, he is prevented from presenting virtually any mitigating information at all to the court at sentencing.

Memorandum Opinion and Order, October 15, 1985 at 37.

already familiar. The trial judge found that if the mitigating factors in question had been presented to him at the original sentencing, the recommended sentence would bear little resemblance to that actually imposed. The sentence the trial court gave appellee "rest[ed] on a foundation of confusion, misinformation and ignorance of facts vitally material to mitigation," *Malcolm, supra,* 432 F.2d at 819. Under these circumstances, the trial court did not abuse its discretion in concluding that the error here was of a fundamental nature.

## IV

In the concluding portion of Judge Nunzio's thirty-nine page Memorandum Opinion and Order, he quotes former Chief Judge Cranch of the Circuit Court of the District of Columbia:

> When the public mind is agitated it ... is the duty of a court to be peculiarly watchful lest the public feeling should reach the seat of justice and thereby precedents be established which may become the ready tools of faction in times more disastrous.... We ought to be upon our guard lest our zeal for the public interest lead us to overstep the bounds of the law and the Constitution.... It then becomes the duty of the judiciary calmly to poise the scales of justice, unmoved by the arm of power, undisturbed by the clamor of the multitude....

William Cranch, Chief Judge, dissenting: *United States v. Bollman and Swartout,* D.C. Reports 1, Cranch 1, December Term 1806 at Washington (January 23, 1807). Judge Nunzio goes on to state:

> This court is not unmindful of the public emotion surrounding the trial of the Hanafi Muslims and of the government's interest in arguing that the sentence originally imposed by this court, remain. But it is in a case such as the one now before this court, that the lofty principles, memorialized in Judge Cranch's erudite words, be heeded lest those principles erode into dust.

This court may set aside the trial court's findings only if the trial court's findings are plainly wrong or without evidence to support them. *United States v. Jackson,* 450 A.2d 419 (D.C.1982); D.C.Code § 17–305(a) (1981). As this court explained in *Johnson v. United States,* 398 A.2d 354, 362–63 (D.C.1979), the concept of

> "exercise of discretion" is a review-restraining one. The appellate court role in reviewing "the exercise of discretion" is supervisory in nature and deferential in attitude.
>
> \*    \*    \*    \*    \*    \*
>
> Judicial discretion will not be reversed unless it appears that it was exercised on grounds, or for reasons, clearly untenable or to an extent clearly unreasonable. Judicial discretion does mean, and can mean, nothing else but exercising the best of the court's judgment upon the occasion that calls it forth. [Citations omitted.]

██ The court in *Johnson* explains that "[s]everal of the most important reasons for deferring to the trial judge's exercise of discretion [are] his observation of the witnesses [and] his superior opportunity to get " 'the feel of the case' ". *Id.* at 362 (citation omitted). The trial judge here, as he put it, "(has) lived with these files." In a well-reasoned, thirty-nine page opinion, the trial court meticulously restated the facts, made findings of fact, and applied the law to the findings of fact. A review of the court's lengthy order as well as the rest of the record demonstrate that the court's findings are not plainly wrong or without evidence to support them, and we find no abuse of discretion.

*Affirmed.*

PRYOR, Chief Judge, dissenting:

I cannot agree that the trial court properly exercised its discretion in granting the writ of error *coram nobis* in this case. As this court has stated recently, the writ is an extraordinary remedy which should only be granted "under circumstances compelling such action to achieve justice." *United States v. Higdon,* 496 A.2d 618, 619 (D.C. 1985) (quoting *United States v. Morgan,* 346 U.S. 502, 511, 74 S.Ct. 247, 252, 98

L.Ed. 248 (1954)). These circumstances must involve errors of fact on the part of the trial court which are so fundamental so as to render the proceeding itself irregular and invalid. *Higdon, supra,* 496 A.2d at 619; *Moon v. United States,* 106 U.S.App. D.C. 301, 303, 272 F.2d 530, 532 (1959). The writ of *coram nobis* is intended to correct errors of fact not apparent on the face of the record and unknown to the trial court. *United States v. Mayer,* 235 U.S. 55, 69, 35 S.Ct. 16, 19, 59 L.Ed. 129 (1914); *see Watwood v. District of Columbia,* 162 A.2d 486, 487 (D.C.1960). There is a presumption that the proceeding in question was without error, and the petitioner seeking *coram nobis* relief bears the burden of showing otherwise, *i.e.,* that there was an error which if uncorrected would lead to a miscarriage of justice. *Higdon, supra,* 496 A.2d at 619–20; *Moon, supra,* 106 U.S. App.D.C. at 303, 272 at 532.

The majority finds that petitioner has carried his burden of demonstrating that evidence of duress was present but unknown to the trial court which, if unaddressed, would lead to a miscarriage of justice.[1] A review of the record and long procedural history of this case indicates, however, that petitioner merely recasts in the guise of his petition for *coram nobis* relief arguments seeking reduction of sentence which have been heard and rejected by this court on several previous occasions.

After a jury trial, appellee Abdul Hamid and eleven other defendants were convicted of conspiracy to commit kidnapping while armed, assault with a dangerous weapon, and eight counts of kidnapping while armed, arising from his participation in the so-called "Hanafi" hostage siege of B'nai B'rith and several other sites in the District on March 9, 1977. Appellee was sentenced to an aggregate of 36 to 108 years in prison, and appealed. This court upheld the verdicts on direct appeal in *Khaalis v. United States,* 408 A.2d 313 (D.C.1979), *cert. denied,* 444 U.S. 1092, 100 S.Ct. 1059, 62 L.Ed.2d 781 (1980).

Appellee subsequently filed a motion to reduce his sentence with the trial court, pursuant to Super.Ct.Crim.R. 35(b), which was granted. The United States then sought, and this court granted, a writ of mandamus ruling that the trial court had exceeded its jurisdictional powers to reduce sentence under Rule 35 because more than 120 days elapsed from receipt of our order affirming the convictions before the trial court acted on the motion for reduction. *United States v. Nunzio,* 430 A.2d 1372 (D.C.1981).[2] The trial court then vacated its January 8, 1981 order reducing appellee's sentence. Appellee then filed a motion pursuant to D.C.Code § 23–110 (1981) alleging ineffective assistance of counsel in that the attorney did not file the motion to reduce sentence within the 120–day limit. The trial court granted the motion, and reduced the sentence to time served. The government appealed, and this court again reversed the trial court in *United States v. Hamid,* 461 A.2d 1043 (D.C.1983), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 718, 79 L.Ed.2d 180 (1984) holding that the Sixth Amendment right of effective assistance of counsel did not extend to post-conviction motions to reduce sentence. The original sentence was subsequently reinstated.

It was at this point, September 13, 1983, that appellee petitioned the trial court for a writ of error *coram nobis,* arguing that the leader of the Hanafis, Hamaas Abdul Khaalis, prevented him from presenting an adequate defense at trial and mitigating factors at the sentencing hearing due to threats, intimidation, and other forms of duress. On May 30, 1985, appellee also filed for a writ of *habeas corpus.* The trial court considered the petitions jointly and after a hearing concluded that both writs should be granted.

1. At the outset, I must observe that I am unpersuaded by the government's assertion that the only means of collateral attack available to appellant is to be found in D.C.Code § 23–110. Rather, we have recently reiterated the availability of the writ of *coram nobis* if its requisites are met. *See Higdon, supra.* I conclude that the requisites are not met here.

2. In 1984, Rule 35 was changed to its present form, which provides that the 120–day limit is no longer jurisdictional, but a filing deadline, and gives the court a reasonable time thereafter to act on the motion.

**648**

In this case, appellee did not file his petition for writ of error *coram nobis* until more than three years after his unsuccessful Rule 35 motion, and more than two years after his first § 23–110 motion.

While it is true that the passage of time is not an absolute bar to a claim for *coram nobis* relief, *see United States v. Morgan, supra,* 346 U.S. at 507, 74 S.Ct. at 250; *Farnsworth v. United States,* 98 U.S.App. D.C. 59, 232 F.2d 59 (1956), 62 A.L.R.2d 423 (1958), it is also true that undue delay or lack of diligence in prosecuting the claim is a factor to be considered, and places the claimant under a heavier burden of proof. *See Farnsworth, supra,* 98 U.S.App.D.C. at 63, 232 F.2d at 63; 62 A.L.R.2d at 438. Indeed, the function of the writ does not relieve the petitioner of his burden of apprising the court of facts within his knowledge in a timely fashion. *See Dearing v. State,* 631 S.W.2d 328, 333 (Mo.1982) (en banc); *Fuller v. State,* 344 So.2d 216, 217–18 (Ala.Crim.App.1977). Thus, a delay of this kind is particularly damaging when the claimant has knowledge of facts which he desires to bring to the court's attention, but fails to do so.

Looking at the total circumstances in this case, I respectfully conclude that petitioner has not satisfied the burden which would warrant the grant of the extraordinary writ of error *coram nobis*.